## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATALIE BEER, as mother and guardian of minor A.B., and CHRISTOPHER BEER, as father and guardian of minor A.B., | **CONSOLIDATED CASES** |
| **Plaintiffs,** | |
| v. | **Case No. 21-2365-DDC-TJJ** |
| USD 512 SHAWNEE MISSION, | |
| **Defendant.** | |
| USD 512 SHAWNEE MISSION, | |
| **Plaintiff,** | |
| v. | **Case No. 21-2604-DDC-TJJ** |
| NATALIE BEER, as parent and next friend of minor A.B., and CHRISTOPHER BEER, as parent and next friend of minor A.B., | |
| **Defendants.** | |
| CHRISTOPHER BEER, as father and guardian of minor A.B., NATALIE BEER, as mother and guardian of minor A.B., | |
| **Plaintiffs,** | |
| v. | **Case No. 21-2608-DDC-TJJ** |
| USD 512 SHAWNEE MISSION, | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

The parties in this case have commenced separate actions under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482.  Both cases result from *In re A.B. v. Shawnee Mission Sch. Dist. USD 512*, Case No. 21DP512-001 and OAH No. 22ED0001 SPED.  In December 2021, USD 512 Shawnee Mission filed its Complaint seeking judicial review of the administrative record under IDEA.  *See* Case No. 21-cv-2604-DDC-TJJ, Doc. 1.  USD 512 asks the court to review the Hearing Officer's Decision, all post-decision relief, the Hearing Officer's Supplemental Decision, and the Review Officer's Decision.  *Id.* at 1–2 (Compl. ¶ 3).  The next day, Natalie and Christopher Beer, on behalf of their child, A.B., filed their own Complaint.  *See* Case No. 21-cv-2608-DDC-TJJ, Doc. 1.  The Beers ask the court to review the Review Officer's decisions about the compensatory education award and USD 512's "child find" obligations.  *Id.* at 4 (Compl. ¶ 11).[1]  Both parties have filed separate Motions for Judgment on the Administrative Record in their respective cases.  *See* Case No. 21-cv-2604-DDC-TJJ, Doc. 28; Case No. 21-cv-2608-DDC-TJJ, Doc. 24.  The parties have briefed these motions fully.  *See* Case No. 21-cv-2604-DDC-TJJ, Docs. 39, 40; Case No. 21-cv-2608-DDC-TJJ, Docs. 35, 36.

After reviewing the administrative record, the court affirms the Review Officer's conclusion that USD 512 procedurally and substantively violated IDEA and denied A.B. a free appropriate public education.  The court thus grants in part, and denies in part the parties' motions.  It explains why, below.

---

[1]     Before either party sought this court's review of the administrative decision, the Beers filed an action in August 2021 seeking attorneys' fees and costs for their administrative and district court actions.  *See* Case No. 21-cv-2365-DDC-TJJ, Doc. 1 at 12–13.  Magistrate Judge Teresa J. James consolidated all three cases under that first-filed case in January 2022.  *See* Case No. 21-cv-2365-DDC-TJJ, Doc. 14; *see also* Case No. 21-cv-2604-DDC-TJJ, Doc. 12; Case No. 21-cv-2608-DDC-TJJ, Doc. 11.  Judge James ordered the parties to continue filing in the separate cases until ordered differently.  Case No. 21-cv-2365-DDC-TJJ, Doc. 14 at 2.

# Contents

I.   Background ........................................................................................................... 5

   A.  Factual Background ......................................................................................... 5

   B.  Procedural Background .................................................................................. 10

II.  Legal Standard .................................................................................................. 14

III.   Analysis ............................................................................................................ 16

   A.  USD 512 Arguments (in 21-cv-2604) ......................................................... 17

      1.  "Best Practices" Evidence ...................................................................... 17

      2.  USD 512's Child Find Obligations ........................................................ 20

      3.  USD 512's Evaluation of A.B. ................................................................ 21

         a.  USD 512's Procedural Evaluation Requirements ................................ 22

         b.  USD 512's Substantive Evaluation Requirements .............................. 27

      4.  USD 512's IEP Implementation ............................................................. 32

         a.  IEP Timeline ........................................................................................ 33

         b.  IEP Development ................................................................................. 38

            i.  Improperly Presented Issues ........................................................... 40

            ii.  The IEP's adequacy .................................................................... 44

               A.B.'s Current Levels ..................................................................... 45

               Vague IEP Language ...................................................................... 50

               Implementing the IEP .................................................................... 53

      5.  Conclusion ............................................................................................. 58

   B.  Beer Family Argument (in 21-cv-2608) ...................................................... 59

   C.  Compensatory Damages (in 21-cv-2604 and -2608) .................................... 64

1.   The Review Officer's Award Decision ......................................................... 69

2.   Parties' Challenges to the Compensatory Award ........................................ 70

   a.   Reimbursement for Riley ABA Instruction ............................................ 70

   b.   Compensatory Education ....................................................................... 73

      i.   USD 512's Challenges ....................................................................... 74

      ii.   The Beers' Challenges ...................................................................... 77

3.   Specific Remedies.......................................................................................... 80

IV.   Conclusion ............................................................................................................ 83

# I.     Background

## A.  Factual Background[2]

A.B. attended elementary school in the Shawnee Mission School District, USD 512.

Doc. 1-1 at 8 (Hr'g Officer's Decision ¶ II.1).  A.B. first attended pre-Kindergarten at Briarwood

Elementary in USD 512 during the 2017–18 school year.  *Id.* (Hr'g Officer's Decision ¶¶ II.2–3).

After pre-K, A.B. began attending Westwood View Elementary, also in USD 512.  *Id.* (Hr'g

Officer's Decision ¶ II.4).  A.B. received diagnoses in January 2019 for both attention deficit

hyperactivity disorder (ADHD) and level two autism spectrum disorder (autism).  *Id.* at 89–90

(Hr'g Officer's Decision ¶ IV.458, 465).  A.B.'s disability included several behaviors:  refusing

or ignoring directions, disrupting class, acting aggressively (both verbally and physically),

property damage, and inappropriately interacting with his peers.  *Id.* at 47 (Hr'g Officer's

Decision ¶ IV.238).

During a district summer enrichment program in 2017, before A.B. entered pre-K, the

Beers learned about their son's social and behavioral difficulties from the program's lead

teacher.  *Id.* at 16–17 (Hr'g Officer's Decision ¶¶ IV.9–18).  The teacher stated that A.B. had

difficulty following directions, withdrew from his peers, and could need additional support in the

upcoming school year.  *Id.* at 17 (Hr'g Officer's Decision ¶¶ IV.11–12, 16).  A.B.'s summer

teacher also conveyed her concerns to a special education teacher for USD 512, so that she could

watch for A.B. during the school year.  *Id.* (Hr'g Officer's Decision ¶¶ IV.13–14).

---

[2]      All citations to court filings in Part I refer to the docket for and filings in Case No. 21-cv-2604-DDC-TJJ, unless otherwise noted.

The court reproduces facts taken from the administrative hearing and gives them "due weight" in its review.  *Murray ex rel. Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995).  IDEA requires the court, when making its decision, to consider only these facts, unless it admits additional facts proposed by the parties.  20 U.S.C. § 1415(i)(2)(C).  The court hasn't admitted any additional facts, so it proceeds on the facts contained in the administrative record.

At the start of the school year in August 2017, the special education teacher forwarded those concerns to A.B.'s pre-K teacher. *Id.* at 18 (Hr'g Officer's Decision ¶¶ IV.22–23). In the fall of 2017, USD 512 conducted an evaluation of A.B. that consisted of teacher and parent interviews, observation, and a play-based assessment test. *Id.* at 24 (Hr'g Officer's Decision ¶¶ IV.71–73). The evaluating team "determined that A.B. was not a child with an exceptionality and was not in need of specially designed instruction for social-emotional skills[.]" *Id.* at 28 (Hr'g Officer's Decision ¶ IV.100). Natalie Beer didn't disagree with the team's determination at that time. *Id.* at 30 (Hr'g Officer's Decision ¶¶ IV.117–118).

In the summer of 2018, after A.B. completed pre-K, the family's pediatrician suggested that the Beers arrange genetic testing for A.B. *Id.* at 34 (Hr'g Officer's Decision ¶ IV.147). The results of that test suggested A.B. may have autism. *Id.* As a result of the genetic testing, the Beers immediately enrolled on the waitlist for an autism evaluation at Children's Mercy Hospital. *Id.* A.B.'s behavior issues persisted into kindergarten during the 2018–19 school year. *Id.* at 35 (Hr'g Officer's Decision ¶¶ IV.153–55). In August 2018, A.B.'s kindergarten teacher emailed advising the Beers that they "could request a full evaluation in writing by providing the request to the principal. [A.B.'s teacher] advised the school must legally have the evaluation completed and reported back to Mrs. Beer in '60 school (not calendar) days.'" *Id.* at 37 (Hr'g Officer's Decision ¶ IV.170). Later that same day, the Beers submitted a request for a written evaluation to Westwood View Elementary School. *Id.* at 38 (Hr'g Officer's Decision ¶ IV.171).

Soon after the Beers' request, representatives from the school met with Natalie Beer to discuss strategies for A.B. *Id.* (Hr'g Officer's Decision ¶ IV.173). This group formed A.B.'s IEP team, led by Kathy Ostby, a school psychologist for several schools in USD 512. *Id.* at 38–39 (Hr'g Officer's Decision ¶¶ IV.174–75, 180). Natalie Beer signed USD 512's prior written

notice to consent to the evaluation on September 5, 2018. *Id.* at 44–45 (Hr'g Officer's Decision ¶¶ IV.223–24). That same day she met with the school IEP team to discuss plans for an initial evaluation designed to determine if A.B. qualified for special education services. *Id.* The IEP team collected data for its evaluation from September through November 2018. *Id.* at 46 (Hr'g Officer's Decision ¶ IV.232). The collected data included a parent interview, functional behavior assessment (FBA) data, FBA observation, and daily behavior reports. *Id.* at 47–48 (Hr'g Officer's Decision ¶ IV.240).

Over the course of A.B.'s evaluation, the data became inconsistent and contradictory, causing a prolonged evaluation period. *Id.* at 96 (Hr'g Officer's Decision ¶ IV.508). After canceling a meeting on November 26 because of inclement weather, the IEP team met on December 6, 2018 to review the evaluation results. *Id.* at 70 (Hr'g Officer's Decision ¶ IV.354). December 6 also marked the 60th school day after the Beers had provided consent, making it the final day for the school to complete its evaluation under IDEA. Doc. 1-3 at 118 (Review Officer's Decision ¶ 82). The summary and conclusions document prepared for that December meeting indicated that the evaluators believed A.B. didn't qualify for services. Doc. 1-1 at 74–75 (Hr'g Officer's Decision ¶ IV.381). By contrast, some of the documents compiled during the evaluation "revealed red flags for the possibility of autism." *Id.* At the meeting, Natalie Beer stated that she didn't believe the evaluation gave a complete picture of A.B.'s behavior. *Id.* at 77 (Hr'g Officer's Decision ¶ IV.394). The IEP team didn't make an eligibility decision at the December 6, 2018 meeting. *Id.* at 81 (Hr'g Officer's Decision ¶ IV.409). Natalie Beer asked to get more data and signed a handwritten addition to the earlier prior written notice, which she backdated to November 28. *Id.* at 82–83 (Hr'g Officer's Decision ¶¶ IV.422–23).

A.B. received his autism and ADHD diagnoses from a psychologist at Children's Mercy Hospital in January 2019. *Id.* at 5, 89–90 (Hr'g Officer's Decision ¶¶ I.34, IV.458, 465). The day after the Beers received the psychologist's evaluation, they provided it to the school team at a meeting on January 17, 2019. *Id.* at 94 (Hr'g Officer's Decision ¶ IV.489). The IEP team didn't reach an eligibility decision at the January meeting. *Id.* (Hr'g Officer's Decision ¶ IV.492). It scheduled a meeting to continue the discussion for February 6, 2019. *Id.* at 94–95 (Hr'g Officer's Decision ¶ IV.496). When preparing for that February meeting, the IEP team determined that A.B. had a qualifying disability under "other health impairment." *Id.* at 97 (Hr'g Officer's Decision ¶ IV.512). During that meeting, the team also discussed considering A.B. for an exceptionality under "autism." *Id.* (Hr'g Officer's Decision ¶ IV.513). Natalie Beer grew upset during that meeting and the IEP team rescheduled it for later that month. *Id.* at 101 (Hr'g Officer's Decision ¶ IV.527).

Before the rescheduled meeting, the IEP team redrafted A.B.'s eligibility report to include outside evaluations and adding the autism diagnosis. *Id.* at 108 (Hr'g Officer's Decision ¶ IV.563). Also before the rescheduled meeting, the Beers—dissatisfied with the evaluation process the IEP team had conducted—emailed USD 512 to request an Independent Educational Examination (IEE) for A.B. *Id.* at 107–08 (Hr'g Officer's Decision ¶ IV.558).

The team planned to discuss a draft Individualized Education Program (IEP) for A.B. during the meeting on February 25, 2019. *Id.* at 111–12 (Hr'g Officer's Decision ¶¶ IV.571–72). But on the day of the meeting, Natalie Beer arrived at the school with her education advocate and didn't enter the conference room where everyone else waited. *Id.* (Hr'g Officer's Decision ¶ IV.572). Instead, one of the team members spoke with Natalie Beer in the hallway for 30 to 40 minutes before returning to the conference room. *Id.* She informed the IEP team that Natalie

Beer had grown upset because she thought the team would continue pushing for an "other health impairment" classification. *Id.* At that point, the IEP team stopped A.B.'s evaluation process. *Id.* at 113 (Hr'g Officer's Decision ¶ IV.581). The school didn't schedule any meetings for the remainder of the school year to discuss A.B.'s IEP. *Id.* (Hr'g Officer's Decision ¶ IV.582). But during the February 25 meeting, the IEP team—without Natalie Beer present—decided that A.B. qualified for services under an autism diagnosis. *Id.* at 112  (Hr'g Officer's Decision ¶ IV.574).

In March 2019, Natalie Beer met with Jill Koertner, an autism coach for USD 512. *Id.* at 116, 120 (Hr'g Officer's Decision ¶¶ IV.595, 612). They met to determine if the Beers agreed with Koertner performing a second FBA for A.B. in accordance with the IEE request. *Id.* at 120 (Hr'g Officer's Decision ¶ IV.612). Natalie Beer agreed to let Koertner perform the FBA. *Id.* Koertner completed that FBA between March and May of 2019 and drafted a new FBA report in May. *Id.* at 121 (Hr'g Officer's Decision ¶¶ IV.613–18). During 2019, the Beers received the FBA multiple times by email. *Id.* at 125 (Hr'g Officer's Decision ¶ IV.644).

In summer 2019, A.B. attended Riley ABA and Autism Center hoping to catch up with his peers academically. *Id.* at 127 (Hr'g Officer's Decision ¶ IV.661). When A.B. began first grade in fall 2019, the IEP team continued to meet and work on providing A.B. with an IEP. *Id.* at 128–153 (Hr'g Officer's Decision ¶¶ IV.665–822). On October 1, 2019, the entire IEP team met for the first time since February 6. *Id.* at 139 (Hr'g Officer's Decision ¶¶ IV.734–35). The team planned at that meeting to develop A.B.'s IEP and get the Beers' consent to implement services. *Id.* (Hr'g Officer's Decision ¶ IV.734). At that meeting, Natalie Beer gave consent to have a special educator help A.B. in the classroom for 50 minutes of "push-in" support each morning. *Id.* at 142 (Hr'g Officer's Decision ¶ IV.758). But she didn't consent to the rest of the IEP at that meeting. *Id.*

After multiple drafts, the team finished an IEP that addressed all areas of concern for A.B. on November 20, 2019. *Id.* at 153 (Hr'g Officer's Decision ¶¶ IV.822, 824). The Beers received A.B.'s IEP by email the following day. *Id.* (Hr'g Officer's Decision ¶ IV.823). The Beers provided consent on December 2, 2019, allowing USD 512 to begin implementing special education services. *Id.* at 160 (Hr'g Officer's Decision ¶ IV.858). After the staff implemented the IEP, his teacher and the rest of the IEP team didn't observe any progress in A.B.'s classroom behavior between December 2019 and March 2020, when the school closed for the COVID-19 pandemic. *Id.* at 159 (Hr'g Officer's Decision ¶¶ IV.856–57).

In January 2020, A.B. informed the Beers that, on a few occasions, he had left his classroom for individual instruction during math, even though that contradicted his IEP. *Id.* at 163 (Hr'g Officer's Decision ¶ IV.881). Natalie Beer requested that the school schedule a paraprofessional during math lessons to assist A.B. completing that work. *Id.* at 164 (Hr'g Officer's Decision ¶ IV.889). In February 2020, the school proposed a trial intervention of paraprofessional support between 12:20–12:50 and 2:20–3:05 on school days. This arrangement would provide A.B. with support more frequently than the math lesson arrangement. *Id.* at 168 (Hr'g Officer's Decision ¶ IV.911). Both A.B.'s removal from the classroom and the extra paraprofessional support proceeded without the Beers' permission. *Id.* at 169 (Hr'g Officer's Decision ¶ IV.913.d). These events prompted the Beers to inform the school that they planned to file an IEP violation complaint with the Kansas State Department of Education (KSDE). *Id.* at 168 (Hr'g Officer's Decision ¶¶ IV.910, 913).

### B.  Procedural Background

On March 11, 2020, the Beers filed a complaint with KSDE. *Id.* at 174 (Hr'g Officer's Decision ¶ IV.938). KSDE issued an investigative report on April 10, 2020. *See* Doc. 20-2 at 31–44 (AR 31–44). This investigation determined that USD 512 had committed "a violation of

special education statutes[.]" *Id.* at 42 (AR 42).  The investigation report also imposed four

corrective action steps on USD 512.  *Id.* at 42–43 (AR 42–43).

In August 2020, the Beers filed a request for a due process hearing.  Their request alleged

nine problems.  *Id.* at 1–30 (AR 1–30).  The hearing occurred over six days in April 2021.  Doc.

1-1 at 7 (Hr'g Officer's Decision ¶ I.44).  The Hearing Officer then issued his decision on July

23, 2021.  *Id.* at 1.  This decision held:

## VII.   Decision

1.   For the reasons detailed in the Findings of Facts and Conclusions of Law
above and, pursuant to K.S.A. 72-3430 and § 34 C.F.R. 300.507, the Hearing Officer rules as
follows as to the issues herein:

    A.   The District failed to satisfy its' "Child Find Obligation" for the 2018-
2019 and 2019-2020 school years with regard to A.B. as specifically alleged in Petitioner's
Due Process Complaint.  K.S.A. 72-3428 and § 34 C.F.R. 300.111(a).

    B.   The District failed to evaluate A.B. to determine his eligibility to receive
special education services as alleged in the Due Process Complaint.  K.S.A. 72-3428 and
§ 34 C.F.R. 300.301.

    C.   The District failed to appropriate determine A.B.'s educational placement
through development of an Individualized Educational Program (IEP) as specifically
alleged in Petitioner's Due Process Complaint.  K.S.A. 72-3428 and § 34 C.F.R. 300.324.

    D.   The District failed to implement A.B.'s IEP's such that he was denied a
free and appropriate publication education as alleged in Petitioner's Due Process
Complaint.  § 34 C.F.R. 300.17.

    E.   The District failed to satisfy IDEA's procedural requirements such that:

        1.   A.B.'s right to a free and appropriate public education was
impeded.

        2.   The parent's opportunity to participate in the decision-making
process was significantly impaired.

        3.   A.B. was deprived of educational benefits as alleged in
Petitioner's Due Process Complaint. K.S.A. 72-3416 and § 34
C.F.R. 300.513.

    G.   There is insufficient evidence to establish the District failed to
appropriate and timely evaluate A.B. for eligibility to receive special education services in
pre-K or kindergarten.

   H. There is insufficient evidence to establish the District denied A.B. a FAPE by providing him instruction in math in the special education room on three occasions during the first grade.

   I. There is insufficient evidence to establish the District denied A.B. a FAPE by proposing to provide adult support for A.B. in the afternoon in response to the parents' demand that A.B. be assigned a para during math.

*Id.* at 220–221 (Hr'g Officer's Decision ¶¶ VII.1.A–I).  The Decision "awarded no compensatory education or other relief" to the Beers.  Doc. 1-2 at 1 (Hr'g Officer's Suppl. Decision ¶ I.B).

After the Beers' counsel asked the Hearing Officer whether a decision concerning remedies would follow, the Hearing Officer told parties he would "entertain a Motion for Reconsideration regarding remedies."  *Id.* at 1–2 (Hr'g Officer's Suppl. Decision ¶¶ I.C–E).  The Beers filed a Motion for Reconsideration of Remedies on July 30, 2021.  Doc. 1-3 at 2 (Review Officer's Decision ¶ 3).  The Hearing Officer issued his Supplemental Decision on August 4, 2021, holding that USD 512, among other things, must:

(1) hire an independent education evaluator to help A.B. meet his educational needs;

(2) hire a special education IEP specialist to help develop A.B.'s IEP;

(3) hire an independent board-certified behavior analyst for the 2021–2022 and 2022–2023 school years to observe A.B.'s progress and provide him with 25 hours of in-home ABA services per year, and recommending that—if in-person education resumes—the analyst provide at least eight hours per week to help staff implement behavior improvement strategies for A.B.;

(4) hire an educational tutor to provide A.B. 25 hours per school year of in-home compensatory education tutoring for the 2021–2022 and 2022–2023 school years;

(5) provide in-person staff training for general and special education staff on best practices for autism and applied behavior analytic teaching;

(6) provide quarterly progress reports;

(7) develop an internal tracking system for responding to students with disabilities; and

(8) reimburse the Beers for supplemental education costs, advocate expenses, private

    evaluation, and attorney fees and costs.

Doc. 1-2 at 3–8 (Hr'g Officer's Suppl. Decision ¶¶ II.B.1–6).

Later in August 2021, both the Beers and USD 512 appealed the Hearing Officer's decision to the Office of Administrative Hearings.  Doc. 1-3 at 2 (Review Officer's Decision ¶¶ 5–6).  On December 1, 2021, the Review Officer issued his Decision.  *Id.* at 1.  The Decision reversed the Hearing Officer's finding that USD 512 had failed to satisfy its child find obligation.  *Id.* at 138 (Review Officer's Decision ¶ A).  But the Review Officer affirmed the remainder of the Hearing Officer's findings.  *Id.* at 138–39 (Review Officer's Decision ¶¶ B–H).

Addressing the Hearing Officer's award to the Beers, the Review Officer also held that the Hearing Officer, in response to a motion for reconsideration, lacked statutory authority to issue his supplemental decision granting compensatory relief.  *Id.* at 139.  But he held that "the RO has the independent authority to render a decision based upon the review conducted."  *Id.* The Decision then granted nearly the same relief to the Beers as the Hearing Officer had granted, with the following exceptions:

- the Review Officer didn't require that USD 512 develop an internal tracking system;

- the Review Officer didn't recommend the behavior analyst provide eight hours per week to assist staff with implementing behavior improvement strategies; and

- the Review Officer didn't award attorneys' fees.

*Id.* at 142–46.  The Review Officer also noted that the "decision of the [Hearing Officer] to award attorney fees is without legal authority.  Only attorney fees and costs ordered *by a court* and *as provided by federal law* are authorized and enforceable."  *Id.* at 146.

In December 2021, both parties appealed the Review Officer's decision to our court.  *See* Doc. 1 in Case No. 21-cv-2604-DDC-TJJ (USD 512 Compl.); Doc. 1 in Case No. 21-cv-2608-DDC-TJJ (Beers' Compl.).  After an unsuccessful mediation attempt in April 2022, each party filed a separate Motion for Judgment on the Administrative Record in the case it had initiated. *See* Doc. 28 in Case No. 21-cv-2604-DDC-TJJ (USD 512 Mot. J.); Doc. 24 in Case No. 21-cv-2608-DDC-TJJ (Beers' Mot. J.).  The parties have briefed all motions fully and this Order addresses their arguments, below.

## II.     Legal Standard

IDEA establishes a "broad requirement for states to provide students with free, appropriate public education, or 'FAPE,' but relies on specific federal and state regulations for implementation."  *D.T. ex rel. Yasiris T. v. Cherry Creek Sch. Dist. No. 5*, 55 F.4th 1268, 1273 (10th Cir. 2022) (citing 20 U.S.C. § 1412(a)(1)).  To ensure students receive a FAPE, schools must develop an IEP for all eligible students.  20 U.S.C. § 1412(a)(4).  An IEP remains "the means by which special education and related services are 'tailored to the unique needs' of a particular child."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)).  The IEP processes prescribed under IDEA "emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances."  *Id.* (citing 20 U.S.C. § 1414).  When parents and schools disagree, "parents may turn to dispute resolution procedures established by the IDEA."  *Id.*  If more informal negotiations "fail to produce accord, the parties may proceed to what the Act calls a

'due process hearing' before a state or local educational agency." *Id.* at 391–92 (citing 20 U.S.C. § 1415(f)(1)(A), (g)).

Under IDEA, a party may seek judicial review of administrative officers' findings. 20 U.S.C. § 1415(i)(2)(A). When performing that review, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "Thus, the court does not use the substantial evidence standard typically applied in the review of administrative agency decisions, 'but instead must decide independently whether the requirements of the IDEA are met.'" *Murray ex rel. Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995) (quoting *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1167 (7th Cir. 1994)).

Using this standard, the court must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." *Id.* To provide the administrative proceedings with requisite "due weight," the district court must consider the hearing officer's factual findings as prima facie correct. *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004) (citing *Murray*, 51 F.3d at 927 n.11). Also, the court must "give 'due weight' to the reviewing officer's decision on the issues with which he disagreed with the hearing officer, unless the hearing officer's decisions involved credibility determinations and assuming, of course, that the record supports the reviewing officer's decision." *O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998). The party seeking relief must bear the burden of proof.

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005).[3]  Finally, the court's review "must

maintain the character of review and not rise to the level of a *de novo* trial."  *L.B.*, 379 F.3d at

974 (citing *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472–73 (9th Cir. 1993)).

## III.   Analysis

In its motion, USD 512 contests the Hearing Officer's Decision, Supplemental Decision,

and the Review Officer's Decision.  *See* Case No. 21-cv-2604-DDC-TJJ, Doc. 29.  Specifically,

it argues that:  (1) the "best practices" presented by witnesses weren't presented to A.B.'s IEP

team and don't warrant consideration; (2) it satisfied its "child find" obligations for A.B.; (3) it

properly evaluated A.B.'s eligibility; (4) it properly determined A.B.'s education placement by

developing an IEP; and (5) the remedies awarded lack evidentiary support.  *Id.* at 23–72.

Because the Hearing Officer and Review Officer found largely in their favor, the Beers

make a narrower argument to support their motion.  *See* Case No. 21-cv-2608-DDC-TJJ, Doc.

25.  They ask the court to:  (1) award compensatory education for four semesters; (2) reinstate

the eight-hours per week for the behavior analyst to assist in the school building; (3) replace the

Review Officer's discretionary language with compulsory requirements; and (4) find that USD

512 didn't satisfy its "child find" obligations for A.B.  *Id.* at 3–4.

After reviewing the administrative record and all of the parties' arguments in both

motions, the court grants in part, and denies in part the parties' motions.  The court analyzes the

parties' arguments and explains its reasoning, below.  In Part A, the court analyzes the first four

---

[3]      In *Schaffer*, the Supreme Court defined the burden of persuasion in the context of an ALJ hearing under IDEA.  *Schaffer*, 546 U.S. at 57.  Its decision held that unless "Congress intended otherwise," the burden "lies where it usually falls, upon the party seeking relief."  *Id.* at 57–58.  Congress hasn't expressed a different view for judicial review proceedings.  Nor has the Supreme Court or the Tenth Circuit.  The court thus applies *Schaffer*'s approach here, placing the burden of persuasion on the party seeking relief.

arguments made by USD 512.  In Part B, it addresses the Beers' "child find" argument.  And in Part C, it discusses both parties' challenges to the remedies decided by the Review Officer.

### A. USD 512 Arguments (in 21-cv-2604)[4]

#### 1. *"Best Practices" Evidence*

At the hearing, the Beers presented testimony from Dr. Patricia Weigand, a special education and behavior expert, and Dr. Joseph Gentry, an expert on behavior analysis, school psychology, IEPs, and school-based evaluation assessment.  Doc. 1-1 at 179 (Hr'g Officer's Decision ¶¶ V.1–2).  USD 512 contends that these witnesses relied on hindsight evidence unknown to the IEP team when it conducted its assessment and drafted A.B.'s IEP.  Doc. 29 at 23–25.  It argues that such "Monday Morning Quarterbacking" produced unfair prejudice and provided an inaccurate assessment of the processes it undertook to satisfy its IDEA obligations to A.B.  *Id.*

An expert witness qualified "by knowledge, skill, experience, training, or education" may provide opinion testimony if:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  An expert's opinion testimony isn't "objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704.  But "an expert may not state legal conclusions drawn by

---

[4]     All citations to court filings in Part III.A. refer to the docket for and filings in Case No. 21-cv-2604-DDC-TJJ, unless otherwise noted.

applying the law to the facts." *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) (citations omitted).

USD 512 argues that Weigand predicated her testimony "exclusively on her interpretation of professional best practices, not legal requirements." Doc. 29 at 25–26.  It makes similar arguments about Gentry's testimony. *Id.* at 29 ("Dr. Gentry testified that his recommendations . . . were based not on any legal requirement, but on best practices.").  But courts have recognized that testimony involving best practices in cases resolving IDEA disputes can provide expertise beyond the court's acumen and help the factfinder better understand the practices involved. *See, e.g.*, *Souderton Area Sch. Dist. v. J.H. ex rel. J.H.*, 351 F. App'x 755, 759–60 (3d Cir. 2009) (upholding district court's decision to consider school employee's "best practice" testimony on sufficiency of assessment); *Copeland v. District of Columbia*, 82 F. Supp. 3d 462, 470 (D.D.C. 2015) (holding that hearing officer erred by excluding expert testimony from "specialized education expert" when determining compensatory education required); *Bd. of Educ. of Cnty. of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 606 (S.D. W. Va. 2000) (recognizing need for expert testimony about "specialized teaching goals, methods, and standards of education" to understand "nebulous" requirements of IDEA).  This role is precisely the one Fed. R. Evid. 702 envisions for expert witnesses.  That the expert witnesses don't state "legal requirements"—as USD 512 contends—doesn't discredit their testimony.  The task of applying the law belongs to the court, not experts. *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986).

Here, the Hearing Officer found Weigand's testimony "highly credible."  Doc. 1-1 at 179 (Hr'g Officer's Decision ¶ V.1).  The Review Officer found "no reason to question the HO's credibility determination[.]"  Doc. 1-3 at 109 (Review Officer's Decision ¶ 29).  But the Hearing

Officer didn't make any broad credibility findings about Gentry's testimony, and the Review Officer didn't either.[5]  Doc. 1-1 at 179–80 (Hr'g Officer's Decision ¶ V.2); Doc. 1-3 at 110 (Review Officer's Decision ¶¶ 30–31).  In the end, neither decision relied on Gentry's testimony to the extent they used Weigand's to perform the analyses.[6]  *See generally* Doc. 1-1 at 187–220; Doc. 1-3 at 109–38.  Thus, the court will focus on Weigand's testimony as an expert witness.

Weigand's testimony, USD 512 argues, consists of "retroactive application of information unknown by educators and IEP teams at the time" they performed their evaluation and drafted the IEP.  Doc. 29 at 26.  The Tenth Circuit has recognized that "'the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date. . . . Neither the statute nor reason countenance "Monday Morning Quarterbacking" in evaluating the appropriateness of a child's placement.'"  *O'Toole*, 144 F.3d at 701–02 (quoting *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995)).  But Weigand's testimony, for the most part, relied on information available to the IEP team when it performed A.B.'s evaluation and drafted his IEP.  *See* Doc. 20-15 at 128–238, 346–450 (Tr. Vol. I 128:8–238:14, Vol. II 305:13–409:17); *see also* Doc. 1-3 at 109 (Review Officer's Decision ¶ 28) ("Dr. Weigand's conclusions rely solely on the educational records that were available to USD 512 at the time it made educational decisions pertaining to A.B.").

But there is one striking exception.  USD 512 argues that Weigand, when evaluating whether it had met its child find obligations during A.B.'s pre-K year in 2017–18, "relied on

---

[5]     The Hearing Officer also didn't make any broad credibility findings about USD 512's expert witness, Dr. Mitchell Yell.  Doc. 1-1 at 180 (Hr'g Officer's Decision ¶ V.3).

[6]     The Hearing Officer's analysis in the Decision mentions Gentry just once.  "[D]eficiencies in the May 2019 FBA identified by Dr. Gentry and Dr. Weigand all demonstrate how [USD 512]'s IEE refusal both deprived Petitioners of critical information and the ability to meaningfully participate, and deprived A.B. of educational benefit and a FAPE."  Doc. 1-1 at 219 (Hr'g Officer's Decision ¶ VI.168).  The Review Officer's Decision doesn't mention Gentry at all in its analysis.

materials that had never before been made available to the evaluation and IEP teams to form her conclusions." Doc. 29 at 26.  The Review Officer's decision also recognizes that Weigand:

> suggested that [A.B.'s teacher] had expressed a concern that A.B. "was a child with a disability, namely autism" but fails to mention that this suspicion was not expressed during A.B.'s Pre-K year.  It was not until after the school year had ended that Mrs. Beer had raised concerns that A.B. might be autistic, and [A.B.'s teacher] did not react with any surprise to the suggestion.

Doc. 1-3 at 114 (Review Officer's Decision ¶ 59).  The Review Officer considered Weigand's error when determining that USD 512 had met its child find obligations.  *Id.* at 116 (Review Officer's Decision ¶ 72).  Despite Weigand's mistake about the timeline during the child find process, the Review Officer found no reason to view the rest of her testimony as anything less than "highly credible."  *Id.* at 109 (Review Officer's Decision ¶ 29).

After reviewing the record, the court agrees with the Review Officer's findings on this subject.  Weigand based her opinion on what was in A.B.'s record, her education and training, and her experience as a behavior analyst in public schools.  *Id.* at 7 (Review Officer's Decision ¶ 25).  The lion's share of material she presented doesn't qualify as "Monday Morning Quarterbacking," since it was available to the IEP team.  In the lone instance where Weigand erred, the Review Officer ignored her testimony and ruled for USD 512, rendering her mistake harmless.  Thus, USD 512's argument that the court should ignore Weigand's expert testimony is unpersuasive.

### 2.  *USD 512's Child Find Obligations*

USD 512 next contends that it satisfied its child find obligations to A.B.  Doc. 29 at 32–37.  The Review Officer's Decision found for USD 512 on this subject, agreeing that the school district had satisfied its child find obligations.  Doc. 1-3 at 138 (Review Officer's Decision ¶ A). In general, a party doesn't have standing to appeal an order in its favor.  *See, e.g.*, *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1137 (10th Cir. 2011) (recognizing that, generally, "'only

a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal,' and thus a 'party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it.'" (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980))).  An exception recognizes a different conclusion, however, "where a judgment gives the successful party only part of that which he seeks and denies him the balance, with the result that injustice has been done him[.]"  *Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1424 (10th Cir. 1993) (citations omitted).

But that exception doesn't apply here.  The Review Officer decided that USD 512 satisfied its child find obligation in its entirety and didn't incur any liability for failing to do so.  Doc. 1-3 at 138 (Review Officer's Decision ¶ A).  The Review Officer found in USD 512's favor, and thus this court's review of that result can't produce a better outcome for it.  The court thus declines to discuss the child find arguments further here, and instead addresses them under the Beers' Motion for Review.  *See infra* at 59–63 (Part III.B., addressing the Beers' argument that USD 512 didn't satisfy its child find obligations).

### 3.  USD 512's Evaluation of A.B.

USD 512 also argues that the IEP team completed its evaluation of A.B. according to procedural and substantive provisions of Kan. Stat. Ann. § 72-3428 and Kan. Admin. Regs. § 91-40-8(f).  Doc. 29 at 38–47.  The Review Officer's Decision held that USD 512 "failed to timely evaluate A.B. to determine his eligibility to receive special education services such that he was denied a free and appropriate [public] education (FAPE) resulting in lost educational benefit to A.B."  Doc. 1-3 at 1 (Review Officer's Decision ¶ B).  After reviewing the record, the court affirms the Review Officer's findings that USD 512 failed to meet its evaluation obligations to A.B.  The court analyzes and explains its reasoning about USD 512's arguments, below.  Part a.

addresses USD 512's failure to meet the statutory timeline, while Part b. discusses the qualitative shortcomings of USD 512's evaluation of A.B.

### a. USD 512's Procedural Evaluation Requirements

USD 512 contends that it met the procedural requirements for a timely evaluation because Natalie Beer consented to extend the evaluation timeframe in December 2018. Doc. 29 at 38–42. Kan. Admin. Regs. § 91-40-8(f) requires a school district to complete its evaluation and develop an IEP for a child unless it "has obtained written parental consent to an extension of time[.]" Under the Kansas regulations governing the evaluation process, "consent" requires all the following conditions:

(1) A parent has been fully informed of all information relevant to the activity for which consent is sought, in the parent's native language or other mode of communication.

(2) A parent understands and agrees in writing to the carrying out of the activity for which consent is sought, and the consent describes that activity and lists the records, if any, that will be released and to whom.

(3) A parent understands the following:

(A) The granting of consent is voluntary on the part of the parent and may be revoked at any time.

(B) If the parent revokes consent, the revocation is not retroactive and does not negate an action that has occurred after the consent was given and before the consent was revoked.

(C) The parent may revoke consent in writing for the continued provision of a particular service or placement only if the child's IEP team certifies in writing that the child does not need the particular service or placement for which consent is being revoked in order to receive a free appropriate public education.

Kan. Admin. Regs. § 91-40-1(l).

USD 512 argues that Natalie Beer signed a statement at the end of the December 6, 2018 meeting consenting to extend the evaluation period. Doc. 29 at 39. This alleged consent

appeared as a written addition on a copy of a previous prior written notice form dated September

5, 2018.  *Id.* at 40, fig. 1.  On this copy, an unidentified person had written, "Shawnee Mission

School District + Parent agreed to extend evaluation."  *Id.*  Natalie Beer then signed it but wrote

the date as "11-28-18."  *Id.*  The Review Officer noted:

> Mrs. Beer testified that at the end of the meeting on December 6, 2018 she was
> asked to sign the handwritten note on the back of the September 5, 2018 PWN.
> Mrs. Beer testified she thought she was agreeing to extend the evaluation because
> the team was supposed to meet on "November 28, 2018" but was unable to because
> of inclement weather.[7]

Doc. 1-3 at 118 (Review Officer's Decision ¶ 84).

Based on Natalie Beer's testimony and surrounding circumstances, the Review Officer

concluded that the "handwritten agreement is vague and fails to demonstrate that Mrs. Beer was

fully informed of what she was agreeing to."  *Id.* at 119 (Review Officer's Decision ¶ 89).

Because USD 512 "failed to ensure that Mrs. Beer was fully informed regarding the District's

responsibilities and what the extension requested was for[,]" the Review Officer held that Natalie

Beer "was not aware of what [USD 512's] determination was and was not fully informed of the

implications of agreeing to extend the time beyond the 60-school day deadline."  *Id.* (Review

Officer's Decision ¶ 90).

In response, USD 512 argues that two circumstances demonstrate Ms. Beer's

understanding that she had consented by her signature to extend the evaluation period past

December 2018:  (1) Natalie Beer posted to social media in October 2019 stating, in part, "I was

not concerned about the timeline of 60 days because I wanted the evaluation done properly[,]"

and (2) USD 512 issued a prior written notice the same day as the December 6, 2018 meeting

---

[7]     The Review Officer also noted that the "original meeting was scheduled for November 26, 2018, not
November 28, 2018, raising a question as to why the signature was backdated to November 28, 2018.  The only
explanation is the mistaken belief that November 28, 2018 was the last day for USD 512 to complete the initial
evaluation."  Doc. 1-3 at 118 n.90.

that summarized what the IEP team had discussed.  Doc. 29 at 40–41; *see also* Doc. 20-10 at

128–29 (AR 3614–15); Doc. 20-7 at 152–55 (AR 2419–22).  The court doesn't find either

argument persuasive.

*First*, Natalie Beer's social media post, made almost a year after the purported agreement

to extend, can't meet the requirements for written parental consent.  The court located no

authority holding that a months-later statement to a third party may substitute as consent to an

opposing party's previous conduct.  Instead, USD 512 introduces the social media statement as

evidence that Natalie Beer had the relevant information to give her consent to extend the

timeframe.  Doc. 29 at 40.

When presented with evidence, the court "must construe evidence and inferences in favor

of the nonmoving party[.]"  *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017).  In

addition to the language USD 512 quotes, the social media post continued, stating that the

school's team drafted an IEP in February 2019 "[u]nbeknownst to [her]," and then asked

questions of group members about procedural violations.  Doc. 20-10 at 128–29 (AR 3614–15).

When asked about this social media post at the hearing, Natalie Beer testified that she "was

really confused with the process of things" and "was reaching out to ask this group like how

things work and what [she] misunderstood."  Doc. 20-15 at 817 (Tr. Vol. III 732:8–11).

Construing the social media post and its inferences in favor of the Beers, a factfinder

reasonably could interpret Natalie Beer's statement that she "was not concerned about the

timeline of 60 days" to support the Beers' contention that she thought the deadline was in

November and retroactively signed consent to extend until that day.  The post itself and Ms.

Beer's testimony about it at the hearing indicate her state of confusion about the process and her

rights.  This part of the record supports the conclusion that USD 512 hadn't "fully informed [the

Beers] of all information relevant to the activity for which consent is sought[.]"  Kan. Admin. Regs. § 91-40-1(l)(1).  In that context—and in the light most favorable to the Beers as the nonmovant—the social media post doesn't provide evidence that the Beers possessed the requisite informed consent to extend the deadline.

*Second*, USD 512 contends that the prior written notice it provided to the Beers on December 6—which Natalie Beer signed and returned to the school—qualifies as informed written consent to extend the deadline.  Doc. 29 at 41; *see also* Doc. 20-7 at 152–55 (AR 2419–22).  In this document, under a section labeled "Other Factors Relevant to the Proposal or Refusal," Kathy Ostby, the school psychologist, wrote, "Gathering additional data will delay decisions regarding [A.B.'s] eligibility for special education which may be viewed as a potential disadvantage, however the team determined accurately answering eligibility questions outweighs any potential disadvantages."  Doc. 20-7 at 153 (AR 2420).  The notice also stated that the IEP team had scheduled a meeting for January 2019, but mentions nothing beyond that date.[8]  *Id.* Natalie Beer signed this form in the "GIVE CONSENT" box.  *Id.* at 155 (AR 2422).  Her signature on this form supports USD 512's contention that the Beers consented to extend the evaluation past the 60-day deadline on December 6, 2018.

But Natalie Beer's signature on that form bears the date "8-13-2019"—a full eight months after the December 6, 2018 meeting.  *Id.*  Natalie Beer testified at the hearing that she put together several signed forms and returned them to the school in August 2019 because she "was told that [she] had to sign each one" for the process to move forward.  Doc. 20-15 at 697 (Tr. Vol. III 612:18–23).  When she signed these forms, she also included a "letter of dissent."  *Id.*  In her letter, Natalie Beer explained that she signed off "not because [she] agree[d] with it 100%

---

[8]      The prior written notice lists the scheduled meeting date as January 10, 2019.  Doc. 20-7 at 153 (AR 2420). But the IEP team later rescheduled its meeting to January 17.  *Id.* at 221 (AR 2488).

but[ ] to move forward and get [A.B.] the services he needs to be a successful student and citizen." Doc. 20-7 at 537 (AR 2804). The Review Officer recognized that USD 512 didn't start providing special education services to A.B. at that time because the prior written notice forms "did not request parental consent to provide services to A.B." Doc. 1-3 at 74 (Review Officer's Decision ¶ 417). Nor do they contain language seeking consent to extend the deadline.

Nothing in the December 6, 2018 written notice explicitly states that A.B.'s parents had given their consent to extend the statutory deadline, and it lists no special education services requiring consent. *See* Doc. 20-7 at 152–55 (AR 2419–2422). At most, the lack of any explicit statement on the form providing consent suggests the Beers *implicitly* consented to extend the deadline to the January 17, 2019 meeting by signing a form containing language that described the meeting. And they provided this signed consent eight months after the fact. In the same August 2019 communication, the Beers also returned the prior written notice forms for the January 17 and February 7, 2019 meetings. Doc. 20-7 at 225–28, 354–57 (AR 2492–95, 2621–24). These forms bore a large X marking through the "GIVE CONSENT" boxes. *Id.* at 228, 357 (AR 2495, 2624). The Beers' unwillingness to provide consent on those forms supports the argument that, to the extent they arguably provided consent to prolong the deadline, it didn't extend past the January 17 meeting.

Kansas's regulatory timeline gives a school district 60 school days to: (1) conduct its evaluation; (2) meet to determine eligibility and, if the child is eligible, develop an IEP; and (3) implement the IEP.[9] Kan. Admin. Regs. § 91-40-8(f). The IEP team didn't make an eligibility decision about A.B. during that January meeting, nor did it create an IEP. By the January

---

[9]     IDEA provides a deadline of 60 days (not school days) to complete a student's evaluation after receiving parental consent. 20 U.S.C. § 1414(a)(1)(C)(i)(I). But it defers to a state's statute "if the State establishes a timeframe within which the evaluation must be conducted[.]" *Id.*

meeting, Natalie Beer had expressed her dissatisfaction with the team's performance on the first requirement, and nothing in the record demonstrates that the IEP team was ready to complete the second or third requirement. The IEP team didn't complete its evaluation and final eligibility determination until February 25, 2019, and it didn't finalize and implement A.B.'s IEP until December 2019. Doc. 1-3 at 116–17, 121 (Review Officer's Decision ¶¶ 74, 101). The record supports the conclusion that Natalie Beer only intended her signature on December 6, 2018 to provide consent to extend the evaluation period (mistakenly) until that day. Even the most generous interpretation of the record reveals that the Beers gave their consent to extend, at most, until January 17, 2019. USD 512 adduced no evidence to support their contention that the Beers gave informed consent to extend the deadline until December 2019. Thus, the court affirms the Review Officer's finding that USD 512 didn't meet its procedural obligations to evaluate A.B. within 60 school days of the Beers' written request and accordingly denied A.B. a FAPE.

### b. USD 512's Substantive Evaluation Requirements

The Review Officer's holding that USD 512 denied A.B. a FAPE mostly relies on the evaluation's untimeliness rather than its substantive insufficiency. But the decision also notes that Weigand's review of the evaluation "concluded the underlying observations and documentation rendered the evaluation insufficient." Doc. 1-3 at 119 (Review Officer's Decision ¶ 86). Thus, in addition to holding that the evaluation exceeded statutory deadlines, the Review Officer held that the "record, as well as the testimony offered by the expert(s)[,] indicates that the evaluation completed on A.B. was insufficient." *Id.* at 141 (Review Officer's Decision ¶ C). USD 512 principally argues that neither IDEA nor state law "provide a definition, much less criteria, for a 'functional behavior assessment.'" Doc. 29 at 43. The school district states that, although "an FBA may help address behavior issues when it impedes learning of a student or others, the IDEA does not require the IEP team to conduct an FBA to meet this

requirement." Doc. 40 at 14.  In contrast, the Beers contend that inaccuracies in A.B.'s evaluation—including altered results used in the report—demonstrate that it is insufficient.  Doc. 39 at 29–34.  After reviewing the record, the court agrees with the Review Officer.  USD 512 conducted an insufficient evaluation.

USD 512 correctly asserts that federal and state statutes don't impose criteria for the FBA, or even require that IEP teams use an FBA during the evaluation process.  But IDEA imposes several requirements for the evaluation as a whole:

> (2) Conduct of evaluation
> In conducting the evaluation, the local educational agency shall—
>> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining—
>>> (i) whether the child is a child with a disability; and
>>> (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum, or, for preschool children, to participate in appropriate activities;
>> (B) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child; and
>> (C) use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.
> (3) Additional requirements
> Each local educational agency shall ensure that—
>> (A) assessments and other evaluation materials used to assess a child under this section—
>>   . . . .
>>> (iii) are used for purposes for which the assessments or measures are valid and reliable;
>>> (iv) are administered by trained and knowledgeable personnel; and
>>> (v) are administered in accordance with any instructions provided by the producer of such assessments;
>> (B) the child is assessed in all areas of suspected disability;
>> (C) assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided[.]

20 U.S.C. § 1414(b).  The Kansas statute dictates requirements that are similar in substance.  *See* Kan. Stat. Ann. § 72-3428.

USD 512's substantive argument focuses almost exclusively on the FBA performed by the school's IEP team, contending that "Kansas law on FBAs does not dictate their use[,] . . . how they must be implemented[,] or the requisite appropriateness of the content of the FBA or [Behavior Intervention Plan (BIP)]."  Doc. 29 at 43.  While Kansas law doesn't require an FBA as part of a student's evaluation, a school district, if it chooses to include an FBA, must perform that assessment adequately.  *See* Kan. Stat. Ann. § 72-3428(c).  The "evaluation's primary role is to contribute to the development of a sound IEP."  *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 67 (D.D.C. 2008).  Failing to conduct the FBA adequately "may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).  This failure won't "always rise to the level of a denial of a FAPE," but depends on whether "the IEP adequately addresses the child's problem behaviors."  *Id.*

The Hearing Officer's findings outlined the FBA's shortcomings.  For starters, the IEP team used daily behavior reports from A.B.'s teacher that didn't collect "antecedent / behavior / consequence" data—so-called "ABC" data—to fill out the ABC information contained in the FBA Data Collection sheets.  Doc. 1-1 at 65 (Hr'g Officer's Decision ¶¶ IV.329–30).  Also, a large portion of the FBA Data Collection sheets contained incomplete data, "rendering them unreliable for making conclusions regarding why the behavior is occurring."  *Id.* (Hr'g Officer's Decision ¶ IV.331).  These sheets comprised "the source of the underlying data informing the FBAs."  *Id.* (Hr'g Officer's Decision ¶ IV.333).  Weigand also testified that the Data Collection

sheets used during the FBA weren't geared toward collecting data about A.B.'s identified behaviors. Doc. 20-15 at 165–66 (Tr. Vol. I 165:20–166:22). The sheets either identified the incorrect behaviors or insufficiently identified specific target behaviors. *Id.* Each of these factors indicate that the IEP team, in conducting the FBA, failed to use "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child[.]" Kan. Stat. Ann. § 72-3428(c)(3); 20 U.S.C. § 1414(b)(3)(C).

The problems with the FBA contributed to the "inadequate and ineffective evaluation with inaccurate information[,]" which "unnecessarily and unreasonably prolonged the evaluation period and A.B.'s identification beyond the 60 school day requirement[.]" Doc. 1-1 at 205 (Hr'g Officer's Decision ¶ V.119(a)(1)). USD 512 contends that the IEP team "was prepared to make a determination that A.B. was eligible for special education services" by the December 6, 2018 meeting, despite no record evidence that they had documented that decision in the evaluation[10] or communicated it to the Beers. Doc. 1-3 at 119 (Review Officer's Decision ¶ 88). Yet, at that meeting, the IEP team decided to collect additional data on A.B.'s reading skills and, on Natalie Beer's request, further examine the FBA data. Doc. 20-7 at 149 (AR 2416). Typically, courts have difficulty determining shortcomings in an FBA because they "cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP." *R.E.*, 694 F.3d at 190. But here, the record provides that information. The data acquired after this meeting led the IEP team to determine that A.B. qualified for services under an autism diagnosis. If the IEP team had made its eligibility decision at the time

---

[10]     Contrary to USD 512's assertion, the Review Officer found that the "summary and conclusions page, as [complemented] by [USD 512's] internal emails preceding the December 6, 2018 meeting and discussions at the December 6, 2018 meeting, indicates that [IEP team] evaluators determined A.B. did not qualify for services or have a disability." Doc. 1-3 at 43 (Review Officer's Decision ¶ 234).

USD 512 contends it was ready, that evaluation would have relied on incomplete data to develop A.B.'s IEP.  Thus, the FBA—though not required—contained significant deficits.

The FBA wasn't the only part of USD 512's evaluation.  The various tools used during an evaluation inform the IEP team's decisions when developing a student's IEP.  20 U.S.C. § 1414(b)(2)(A).  An IEP "is the primary opportunity for parental involvement in the process[.]" *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 766 (6th Cir. 2001).  Developing an IEP is a "fact-intensive exercise . . . informed not only by the expertise of school officials, but also by the input of the child's parents or guardians."  *Endrew F.*, 580 U.S. at 399 (citations omitted).  "An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (holding that school district's failure to provide records to parents of an autistic student constituted a denial of FAPE).

The record here reveals that other aspects of the evaluation—besides the faulty FBA—came up short.  The Hearing Officer's Decision found that USD 512 "failed to communicate critically important information" to the Beers about other parts of its evaluation.  Doc. 1-1 at 209 (Hr'g Officer's Decision ¶ V.138).  For instance, the report omitted information from the BASC-3 assessment—namely, "that A.B. was likely a child with ASD, a qualifying disability under the IDEA suspected by [USD 512] and the Beers[.]"  *Id.*  It also found that USD 512 "altered the Woodcock Johnson scores depicted in [A.B.'s] evaluation" by leaving out percentile scores and changing reading category classifications from "very low" and "extremely low" to simply "low" when memorializing those results.  *Id.*  And the Decision held that USD 512 "failed to accurately collect and communicate the number of times that A.B. was removed from the general education

environment." *Id.*  None of this information made it into the documents provided to the Beers, preventing them from gaining a true understanding of A.B.'s school performance and behaviors. These deficiencies in the evaluation process prevented the Beers "from participating fully, effectively, and in an informed manner in the development" of A.B.'s IEP.  *Amanda J.*, 267 F.3d at 894.

Both the Hearing Officer and the Review Officer found that USD 512 failed to provide A.B. with a FAPE because its insufficient evaluation caused a delay in the process that exceeded the 60 school day requirement and prolonged A.B.'s ability to receive special education services. *See* Doc. 1-1 at 205 (Hr'g Officer's Decision ¶ V.119(a)(1)); Doc. 1-3 at 120 (Review Officer's Decision ¶ 91).  The court holds that the record supports these findings.  The court thus affirms the Review Officer's Decision that USD 512 violated IDEA—both procedurally and substantively—by failing to evaluate A.B. adequately and within the statutory timeframe.  This violation deprived A.B. of a FAPE.

### 4.  USD 512's IEP Implementation

As already discussed above, *see supra* at 22–27 (Part III.A.3.a.), USD 512 failed to develop and implement A.B.'s IEP within 60 school days, violating Kan. Admin. Regs. § 91-40-8(f) and 20 U.S.C. § 1414(a)(1)(C)(i)(I).  In addition, once an IEP team determines a student is eligible for services, Kansas schools must ensure that they meet and develop an IEP within 30 calendar days of that determination.  Kan. Admin. Regs. § 91-40-8(h).  The school district also must ensure that each exceptional child has an IEP in effect at the start of each academic year. Kan. Admin. Regs. § 91-40-16(b)(3).  The Review Officer determined that USD 512 failed to meet these timeline requirements, depriving A.B. of a FAPE.  Doc. 1-3 at 121 (Review Officer's Decision ¶ 103).  Also, the Review Officer held that USD 512 committed both procedural and

substantive violations of IDEA during the IEP's development, which also deprived A.B. of a FAPE.  Doc. 1-3 at 133–35 (Review Officer's Decision ¶¶ 153–64).

USD 512 argues that delays in developing and implementing the IEP resulted from the Beers' refusal to participate in the process and consent to services.  Doc. 29 at 47–50.  And, the school district contends, the IEP team adequately developed an IEP that was reasonably calculated to meet A.B.'s educational goals.  *Id.* at 50–62.  After reviewing the record, the court concludes that the evidence supports the Review Officer's findings that USD 512 denied A.B. a FAPE by failing to provide a timely IEP reasonably calculated to allow him to make appropriate progress.  Below, the court addresses USD 512's failure to meet statutory deadlines in Part a.  Part b. examines the insufficient IEP.

### a.   IEP Timeline

USD 512 argues that it wasn't "'required to convene an IEP Team meeting or develop an IEP under'" IDEA because the Beers hadn't "consent[ed] to the initial provision of special education and related services[.]"  Doc. 29 at 49 (quoting 34 C.F.R. § 300.300(b)(3)(iii)).  USD 512 contends that refusal to consent to "the initial provision of special education and related services" includes the situation when a parent "specifically rejects the evaluation and proposed IEP[.]"  *Id.*  This argument fails for two reasons.

*First*, USD 512 fails to demonstrate how the evaluation and draft IEP qualify as special education services.  IDEA and Kansas regulations give specific instructions about the need for consent to perform an initial evaluation.  *See* 20 U.S.C. § 1414(a)(1)(D)(ii)(I); 34 C.F.R. § 300.300(a); Kan. Admin. Regs. § 91-40-27(a)(1).[11]  But the need to acquire parental consent

---

[11]     The Kansas regulations also include development and implementation of the IEP as part of the initial evaluation process that requires parental consent.  The Supreme Court has defined the IEP as "the means by which special education and related services are 'tailored to the unique needs' of a particular child."  *Endrew F.*, 580 U.S. at 391 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181

for providing special education services appears *in a separate provision* of the regulations governing consent. *See* 20 U.S.C. § 1414(a)(1)(D)(ii)(II); 34 C.F.R. § 300.300(b); Kan. Admin. Regs. § 91-40-27(a)(2); *see also* 20 U.S.C. § 1414(a)(1)(A) (requiring school districts to "conduct a full and individual initial evaluation . . . *before the initial provision of special education and related services* to a child with a disability" (emphasis added)). The Kansas regulations also make clear that a school district "shall not construe parental consent for initial evaluation as consent for the initial provision of special education and related services[.]" Kan. Admin. Regs. § 91-40-27(d). This distinction demonstrates that a parent disagreeing or rejecting the evaluation's findings isn't the same thing as failing to give consent for special education services. The regulations mention only the latter as excusing a school district from its requirement to develop an IEP. 34 C.F.R. § 300.300(b)(3)(iii).

Here, the Hearing Officer found that even if USD 512 emailing a draft IEP to the Beers "could satisfy [USD 512's] obligation and Ms. Beer's subsequent correspondence" was deemed to reject the "proposed" IEP, "she was right to reject it." Doc. 1-1 at 208 (Hr'g Officer's Decision ¶ V.136). Without disputing or addressing the Hearing Officer's holding, the Review Officer determined:

> It appears Mrs. Beer was a contributing factor in the failure to meet. Mrs. Beer, by email dated February 21, 2019, requested an independent educational evaluation (IEE) of A.B. Mrs. Beer again voiced her concern that the FBA and other evaluative documents did not represent A.B. and that further evaluation was necessary in order to address A.B.'s needs. [USD 512] responded by conducting more evaluation of A.B. and made no further attempt to conduct an IEP meeting.

Doc. 1-3 at 121 (Review Officer's Decision ¶ 99). Though the Decision names Natalie Beer as a "contributing factor," that contribution consisted of requesting an IEE, which is her right under

---

(1982)). Thus, the IEP doesn't qualify as a special education service in itself. Instead, it's the mechanism for implementing special education services.

IDEA.  *See* 34 C.F.R. § 300.502(b)(1) ("A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency[.]").  Here, were the court to interpret a parent exercising her statutory right to request an IEE as, instead, a refusal to provide consent—thereby releasing a school district from its obligations under IDEA—the court would take a position "contrary to the overall evaluation process established in the IDEA, as well as the purpose of the IEE right itself."  *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 165 (2d Cir. 2020).

USD 512 doesn't dispute that Natalie Beer, when she emailed the school in response to the evaluation form and draft IEP, requested an IEE.  Doc. 29 at 48.  But by framing her request as a refusal to provide consent, USD 512 suggests that her IEE request nullified the statutory timeframe for USD 512 to develop and implement an IEP.  But nothing under the relevant regulations requires or permits a school district to stop developing an IEP when a parent invokes her right to request an IEE.  *See* 34 C.F.R. § 300.502; Kan. Admin. Regs. § 91-40-12; Kan. Admin. Regs. § 91-40-8(f), (h).  Only informed parental consent may extend a deadline under these regulations.  Kan. Admin. Regs. § 91-40-8(f).

Just because a parent disagrees with the results or form of an evaluation—or the draft of an IEP—a school district isn't excused from providing services or fulfilling the remainder of its statutory obligations.  *See, e.g.*, *D.S.*, 975 F.3d at 165 ("[B]ecause the IDEA requires an evaluation to be comprehensive, one would expect that a parent is free to disagree with an evaluation based on its deficient scope.").  USD 512 hasn't convinced the court that "reject[ing] the evaluation and proposed IEP" qualifies as a failure to "consent to the initial provision of special education and related services" under 34 C.F.R. § 300.300(b)(3)(iii).  Doc. 29 at 49.

*Second*, USD 512 also fails to demonstrate that it actually sought informed parental consent after sending the draft IEP to the Beers.  The Review Officer found that:

> Even after [USD 512] concluded A.B. was a child with an exceptionality, autism, on February 25, 2019, [it] failed to convene an IEP team meeting until October 1, 2019.  [USD 512] did not make any effort to convene an IEP team meeting to develop an IEP for A.B. in the spring of 2019, nor did [USD 512] make any reasonable and prompt efforts to obtain informed consent from the Beers to implement any services to A.B.

Doc. 1-3 at 121 (Review Officer's Decision ¶ 98).  USD 512 contends that it didn't need to proceed with developing the IEP since Natalie Beer "rejected the evaluation and IEP and [USD 512] was not required to override her rejection."  Doc. 29 at 48.  And it also cites the meetings that Natalie Beer had with USD 512 employees to conduct a new FBA as part of the IEE.  *Id.* at 48–49.  But USD 512 never argues that it sought parental consent for services until October 1, 2019.  *Id.* at 49.  This supports the Review Officer's finding that USD 512 failed to seek parental consent to extend the deadline for completing the IEP.  After reviewing the record independently, the court can't find any evidence that USD 512 requested parental consent between February 25 and October 1, 2019.  Nor can the court find evidence that the Beers refused to provide consent for special education services at any point during that same period.

The Beers didn't meet with the IEP team between February 6 and October 1, 2019.  The team made its eligibility decision at the February 25, 2019 meeting without the Beers.  Even if the court doesn't treat the eligibility decision as valid until October 1—when the school's team first met to discuss the IEP with Natalie Beer after it made the eligibility decision without her—USD 512 still failed to meet the requirement that it develop an IEP within 30 calendar days of making an eligibility determination under Kan. Admin. Regs. § 91-40-8(h).[12]  The time between

---

[12]  Kan. Admin. Regs. § 91-40-8(h) states:  "*In complying with subsection (f)*, each agency shall ensure that an IEP is developed for each exceptional child within 30 days from the date on which the child is determined to need special education and related services."  *Id.* (emphasis added).  The initial clause of this provision indicates that the

October 1 (when the IEP team met with Natalie Beer) and December 2 (when the IEP team finalized and implemented A.B.'s IEP) spans 62 calendar days—well beyond the 30 calendar days required under the regulation.

USD 512 tries to place the blame for A.B.'s extended evaluation and IEP period on the Beers.  But the Kansas regulations for developing an IEP place the burden of initiating and scheduling meetings on the school district conducting the evaluation.  Kan. Admin. Regs. § 91-40-16(a).  And the regulations require that school districts "shall obtain" parental consent—not that parents "shall provide" it.  This means the school district retains the burden for getting consent to exceed deadlines.  *See* Kan. Admin. Regs. § 91-40-27(a) ("Except as otherwise provided in this regulation, each agency shall obtain parental consent[.]"); Kan. Admin. Regs. § 91-40-8(f) ("Unless an agency has obtained written parental consent to an extension of time . . . the agency shall complete the following activities within 60 school days of the date the agency receives written parental consent for evaluation[.]").  Because USD 512 owns the burdens to meet the statutory deadlines, schedule meetings, and solicit parental consent, the IEP team needed to get informed consent from the Beers to extend those deadlines when—for example—the IEP team couldn't hold meetings because of the Beers' schedule.  USD 512 failed to meet this responsibility.

As discussed above, *see supra* at 22–27 (Part III.A.3.a. (concluding that USD 512 failed to get parental consent to extend the evaluation deadline)), USD 512 adduced no evidence that the Beers consented to extend the deadline to complete the evaluation and implement A.B.'s IEP past January 2019—let alone to December 2 of that year.  Kansas regulations required USD 512

---

30 calendar days to complete the IEP after deciding a student's eligibility should occur *within* the 60 school day deadline imposed by § 91-40-8(f).  Thus, divorcing the 30-day requirement from the evaluation timeframe goes well beyond even the most charitable reading of § 91-40-8(h).  And still, USD 512 failed to meet that deadline.

to get informed parental consent to extend the deadline, or else it needed to hold required meetings to create and implement the IEP within the statutory timeframe.  USD 512 did neither.

The court concludes that USD 512 can't meet its burden to demonstrate that the Review Officer erred by holding that USD 512 "failed to develop and implement an IEP for A.B. within the required timeframe . . . result[ing] in a substantive IDEA violation and denial of a FAPE to A.B."  Doc. 1-3 at 120 (Review Officer's Decision ¶ 91).  And after reviewing the record, the court affirms the Review Officer's Decision on this point.

### b.   IEP Development

In addition to the timeline violation, the Review Officer held that USD 512 had "deprived A.B. of an IEP reasonably calculated to enable him to make appropriate progress in light of his circumstances, and substantively violated the IDEA."  *Id.* at 133 (Review Officer's Decision ¶ 157).

Under IDEA, an IEP carries great importance as the "centerpiece" for providing a student with a FAPE.  *Endrew F.*, 580 U.S. at 391 (citations omitted).  The IEP team must complete the IEP "in compliance with a detailed set of procedures[,]" to produce a document able to administer special education services "tailored to the unique needs of a particular child[.]"  *Id.* (quotation cleaned up).  The resulting IEP must withstand court scrutiny as "reasonably calculated to enable the student to receive educational benefits."  *O'Toole*, 144 F.3d at 701 (quotation cleaned up).  To that end, IDEA requires that the IEP include certain things, specifically:

> (I) a statement of the child's present levels of academic achievement and functional performance, including—
>
> (aa) how the child's disability affects the child's involvement and progress in the general education curriculum;
>
> . . . .

(II) a statement of measurable annual goals, including academic and functional goals, designed to—

    (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

    (bb) meet each of the child's other educational needs that result from the child's disability;

(III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—

    (aa) to advance appropriately toward attaining the annual goals;

    (bb) to be involved in and make progress in the general education curriculum in accordance with subclause (I) and to participate in extracurricular and other nonacademic activities; and

    (cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph;

(V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc);

(VI)(aa) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 1412(a)(16)(A) of this title; and

. . . .

(VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications[.]

20 U.S.C. § 1414(d)(1)(A)(i).  Kansas uses the same language in its statute to express the same substantive requirements.  Kan. Stat. Ann. § 72-3429(c).

The Review Officer held that the approved IEP "had numerous, substantial defects, most glaringly the failure to incorporate up-to-date evaluation results."  Doc. 1-3 at 132 (Review Officer's Decision ¶ 147).  The Review Officer's Decision also concluded that USD 512 had "failed to take necessary steps to revise A.B.'s Current IEP in that it recognized that vague terms in A.B.'s IEP and/or BIP resulted in staff confusion" and that it "failed to define those terms and failed to propose definitions to A.B.'s parents despite committing to do so."  *Id.* at 133 (Review Officer's Decision ¶ 155).  USD 512 argues that the IEP team produced and implemented a satisfactory IEP that met the requirements of IDEA because it used A.B.'s present levels to develop measurable goals, employed appropriate and specific language, and adequately tracked A.B.'s progress.  Doc. 29 at 50–54, 58–62.  Any contrary conclusions, USD 512 contends, constitute "Monday Morning Quarterbacking" that judged the IEP in hindsight.  *Id.* at 50.  It also argues that the Beers improperly raised issues at the due process hearing that they hadn't included in their Amended Due Process Complaint.  *Id.* at 54–58.  The court addresses, first, the school district's argument about improperly presented issues.  Then, the court discusses USD 512's argument that the IEP substantively was sufficient.

i.      Improperly Presented Issues

Both federal and Kansas law limits what parties can discuss at the due process hearing. *See* 20 U.S.C. § 1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise."); Kan. Stat. Ann. § 72-3416(b)(6) (permitting parties "the right to prohibit the other party from raising, at the due process hearing, any issue that was not raised in the due process complaint notice or in a prehearing conference

held prior to the hearing").  USD 512 argues that the Beers' notice didn't include claims "relating to or arising from [USD 512's] failure to revise the IEP to include reading and fine motor goals[,]" and that they nonetheless raised those issues impermissibly at the hearing.  Doc. 29 at 54.

The Beers respond, arguing that they properly pleaded those claims in their Amended Notice of Parent's Request for Special Education Due Process Hearing.  Doc. 39 at 55; *see also* Doc. 20-2 at 200–28 (AR 200–28).  But the Amended Notice won't abide their argument for it contains no reference to reading or fine motor needs.  *See* Doc. 20-2 at 200–28 (AR 200–28).  The Beers also argue that mentioning the IEP's failure to account for fine motor skills in their response to interrogatories put USD 512 "on notice."  Doc. 39 at 55; *see also* Doc. 20-2 at 487 (Pet'rs' Resp. to Interrogs. 17 (AR 487)).

Requiring the due process complaint to include all issues for the hearing "serves as fair notice to the school district, and gives the district 30 days to resolve the complaint to the parents' satisfaction before a hearing."  *B.P. ex rel. S.H. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 849 (2d Cir. 2015) (citing 20 U.S.C. § 1415(f)(1)(B)(ii)).  For this principle to function, "parents cannot hold back claims until after expiration of the resolution period."  *Id.* (citing *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014)).  Thus, while "IDEA itself contemplates some flexibility[,]" and courts shouldn't "mechanically appl[y]" the waiver rule, the fair notice requirement prevents "parents from sandbagging the school district by raising claims after the expiration of the resolution period."  *C.F.*, 746 F.3d at 78 (quotation cleaned up).

Here, the Beers' response to USD 512's interrogatories post-dated that 30-day window for USD 512 to resolve the complaint.  The responses arrived more than 180 days after the resolution period had expired.  *See* Doc. 20-2 at 493 (AR 493) (showing service of responses on

March 1, 2021); Doc. 20-2 at 234 (AR 234) (showing request for due process hearing on August 14, 2020).  The Beers' omitting the motor skills issue from their due process complaint deprived USD 512 of its ability to address that issue within the resolution period.  Given this failure, IDEA prohibits the Beers from introducing it at the hearing, unless USD 512 agreed otherwise. *See* 20 U.S.C. § 1415(f)(3)(B).

The record reveals the school district didn't agree to waive the Beer's untimeliness.  At the hearing, USD 512 objected when the Beers introduced testimony about A.B.'s fine motor skills.  Doc. 20-15 at 978–80 (Tr. Vol. IV 839:23–841:10).  The Hearing Officer nonetheless permitted the testimony.  *Id.* at 980 (Tr. Vol. IV 841:4–10).  The Officer then included the information about USD 512's failure to incorporate fine motor skills in his conclusion that USD 512 had denied A.B. a FAPE.  *See* Doc. 1-1 at 206 (Hr'g Officer's Decision ¶ V.119(b)(2)) (holding USD 512 denied A.B. a FAPE by "[u]nreasonably refusing to evaluate and identify A.B.'s needs in fine motor within a reasonabl[e] time after its Child Find duty to evaluate was triggered, despite knowledge and concern that A.B. 'writes like a 3-year-old' and needed an OT evaluation").  The Review Officer's Decision, on the other hand, didn't mention A.B.'s fine motor skills in its findings, but did discuss them in the order's compensatory award.  *See* Doc. 1-3 at 142–43 (Review Officer's Decision ¶ 1(e)) (holding that USD 512 shall implement an IEP that includes "any and all OT services to address A.B.'s fine motor skills as recommended through the completion of an independent OT evaluation").  But USD 512 never agreed to allow the Beers to insert A.B.'s fine motor skills as an issue.  Thus, A.B.'s fine motor skills shouldn't factor into either the decision or awarding of compensatory education because the Beers failed to include that issue in their due process complaint.

In contrast, the issue of A.B.'s reading skills presents a different problem.  The Beers argue that USD 512 didn't preserve its objection to their introducing that issue because USD 512 never raised an objection during the hearing, despite multiple discussions about A.B.'s reading skills during testimony.  Doc. 39 at 56 (citing Doc. 20-15 at 707, 712, 789–90, 957, 960–61, 977–78, 1423 (Tr. Vol. III 622:2–9, 627:18–25, 704:4–705:1; Vol. IV 818:3–9, 821:14–822:25, 838:21–839:6; Vol. V 1230:6–21)).  They also contend that USD 512 "opened the door for this issue" by questioning its own witnesses about introducing a reading goal for A.B. and inviting cross-examination on the issue.  *Id.* (citing Doc. 20-15 at 1422, 1423, 1428, 1440 (Tr. Vol. V. 1229:4–21, 1230:6–21, 1235:8–19, 1247:7–10)).

To support their argument, the Beers cite *M.H. ex rel. P.H. v. New York City Department of Education*, 685 F.3d 217 (2d Cir. 2012).  There, the Second Circuit addressed the "threshold issue" before it:  "whether the reviewing officers could consider the evidence related to the various methodologies for teaching autistic children[.]"  *Id.* at 249.  The plaintiffs hadn't included the teaching methodologies issue in their due process complaint.  *Id.* at 250.  And yet, both parties presented at the hearing about teaching methodologies.  *Id.*  The Hearing Officer considered the methodologies issue when she issued her decision.  *Id.*  On appeal, the Review Officer held that the Hearing Officer shouldn't have included that issue since the plaintiffs omitted it from their due process complaint, thus waiving it.  *Id.*  But the district court overturned the Review Officer and the Second Circuit affirmed, holding that "it does not follow from the fact that the [Department of Education] bears the burden of demonstrating that the IEP provides a FAPE that it should be permitted to argue issues outside the scope of the due process complaint without 'opening the door' for the plaintiffs."  *Id.*

43

*M.H.*'s facts include one notable difference from the facts here.  In *M.H.*, the district court held that the Department of Education had injected the methodology issue, "first in its opening statement, and then in the questioning of its first witness[.]"  *Id.* (citing *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 149 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012)).  In contrast here, the Beers concede that *they* first introduced the issue of A.B.'s reading problems when they raised it in their opening statement, albeit without objection from USD 512.  Doc. 39 at 56 (citing Doc. 20-15 at 14–18 (Tr. Vol. I 14:20–18:10)).  But that difference doesn't foreclose the possibility that USD 512 waived its objection to the reading issue.  Even though the Beers first raised the issue, USD 512 questioned its own witness about a reading goal in A.B.'s IEP.  Doc. 20-15 at 1423 (Tr. Vol. V 1230:6–21).  And the school district called the school's reading specialist to testify about A.B.'s reading capabilities.  *Id.* at 1428–43 (Tr. Vol. V 1235:2–1250:10).  During the hearing, USD 512 participated in this issue by providing testimony and adducing evidence about A.B.'s reading skills.  And the school district never objected to the Beers introducing the issue.  While this fact doesn't mean USD 512 explicitly agreed to allow the issue into the hearing, it does align with the principle embraced by the Second Circuit, *i.e.*, a school district's use of an omitted issue at the hearing means it's only fair that the parents may use that issue as well.  *M.H.*, 685 F.3d at 250.

Thus, the court holds that USD 512 waived its objection to the Beers' arguments about including a reading goal in A.B.'s IEP.  The administrative decisions didn't err when they considered that issue.  But the Beers omitted the issue of A.B.'s fine motor skills in their due process complaint and they introduced it improperly during the hearing.

ii.    The IEP's adequacy

The Review Officer held that A.B.'s IEP wasn't reasonably calculated to enable A.B. to make appropriate progress because it contained outdated baseline levels in its goals.  Doc. 1-3 at

122–34 (Review Officer's Decision ¶¶ 104–58).  Also, the Review Officer's Decision concluded that USD 512 had failed to implement A.B.'s IEP and track his progression toward its goals.  *Id.* at 134–35 (Review Officer's Decision ¶¶ 159–64).  USD 512 challenges the Review Officer's holdings, arguing that the IEP used current achievement levels, employed appropriately specific language, and adequately implemented A.B.'s IEP.  Doc. 29 at 50–54, 58–62.

IDEA establishes the IEP to serve as a "natural source of guidance" when "determining what it means to 'meet the unique needs' of a child with a disability[.]"  *Endrew F.*, 580 U.S. at 401 (quoting 20 U.S.C. § 1401(29)).  The IEP must describe "a child's present level of achievement, including explaining 'how the child's disability affects the child's involvement and progress in the general education curriculum.'"  *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa)).  It also must include "'a statement of measurable annual goals . . . designed to . . . enable the child to be involved in and make progress in the general education curriculum[.]'"  *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)).  Those measurable goals must correspond with "a description of specialized instruction and services that the child will receive." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).  The IEP should aspire to an "appropriately ambitious" educational program "in light of [the child's] circumstances," which sets a standard "markedly more demanding than [a] 'merely more than *de minimis*' test[.]"  *Id.* at 402.

### A.B.'s Current Levels

Here, the Review Officer noted that the outline of A.B.'s present levels of academic achievement and functional performance (PLAAFP) in the adopted IEP—the draft dated November 20, 2019—used many statements from earlier iterations of the plan.  Doc. 1-3 at 130 (Review Officer's Decision ¶ 136).  The Decision held that these statements "were obviously based on outdated evaluation documents completed in the Fall of 2018 during A.B.'s

kindergarten year and did not take into consideration any changes that may have been noted in the second evaluation that was completed in the Spring of 2019." *Id.*

The Review Officer observed that the original IEP draft from February 2019 had used the original data from A.B.'s initial evaluation during fall 2018 in its PLAAFP statements. *Id.* at 127–28 (Review Officer's Decision ¶ 126) (stating that the February 2019 PLAAFP was based on evaluations "completed between September and December of 2018"). The IEP team then carried over large portions of these statements to the second draft in October 2019 without integrating any new data from the second evaluation completed in May 2019. *Id.* at 128 (Review Officer's Decision ¶ 128). The team had revised the wording of the three goals—behavior, social, and communication—but the "PLAAFP statements provided as baseline data . . . were identical to the PLAAFP statements in the February IEP[,]" omitting the most recent data from May 2019. *Id.*; *also compare* Doc. 20-7 at 588–91 (AR 2855–58) (February IEP), *with id.* at 691–94 (AR 2958–61) (October IEP). Also, it didn't consider the completed speech IEE. Doc. 1-3 at 128 (Review Officer's Decision ¶ 128).

The Review Officer then noted that the next draft of the IEP—dated November 10, 2019—contained some changes to the behavior goal. *Id.* at 129 (Review Officer's Decision ¶ 135). The language included references to some behaviors and percentages without explaining their origins, and the "PLAAFP statement for the behavior goal had additional information included with it, although there was no indication where the additional information was derived from." *Id.*; *also compare* Doc. 20-7 at 691–94 (AR 2958–61) (October IEP), *with* Doc. 20-8 at 161–67 (AR 3127–33) (November IEP). Notably, the November 2019 draft contained three new behavior goals, *see* Doc. 20-8 at 165–67 (AR 3131–33), in addition to three other goals that remained the same from earlier drafts. These new goals included data in the "PLAAFP Baseline

Data" box, but didn't clarify when or how the IEP team had collected that data. *Id.* The Review Officer concluded that "[i]n essence, the November 10, 2019 draft IEP was the same as the one that had been proposed in October of 2019[,]" and it appeared to rely on the same data as previous iterations. Doc. 1-3 at 129 (Review Officer's Decision ¶ 135). Ultimately, these drafts didn't garner parental consent and thus, themselves don't violate IDEA. But the Review Officer held that, through "failing to substantially rework the proposed IEP, [USD 512] unnecessarily prolonged the IEP process, a process that had already long exceeded the statutory time limits[,]" and thus violated IDEA by denying A.B. a FAPE. *Id.* (Review Officer's Decision ¶¶ 133–34).

The IEP team drafted the current IEP on November 20, 2019, and the Beers provided their signed consent to it on December 2. *See* Doc. 20-8 at 226–240 (AR 3192–3206). The Review Officer noted that the communication goal in this draft remained identical to all the earlier drafts. Doc. 1-3 at 130 (Review Officer's Decision ¶ 136). The PLAAFP Baseline Data on the communication goal states, "Based on the Social[ly] Savvy checklist . . . [A.B.] scored 13 out of 28 on his ability to be flexible with unexpected situations." Doc. 20-8 at 232 (AR 3198). *Cf.* Doc. 20-7 at 591 (AR 2858) (February IEP using exact same language). This data referenced the first Socially Savvy checklist conducted for A.B., as the IEP team "did not add information pertaining to the second Socially Savvy Assessment conducted on February 19, 2019 to the February 25, 2019 evaluation." Doc. 1-3 at 62 (Review Officer's Decision ¶ 339). The PLAAFP in the current IEP, for the first time, integrated the February 25 Socially Savvy Survey, Doc. 20-8 at 229 (AR 3195), but the communication goal doesn't demonstrate that the IEP team considered it since that goal remains the same as in the February draft.

The current IEP also ended the original social and behavior goals from the earlier drafts. Doc. 20-8 at 231, 233 (AR 3197, 3199). But the IEP kept the "Behavior 2" goal introduced in

the November draft and added two social goals—"Social 2" and "Social 3"—as replacements. *Id.* at 234–236 (AR 3200–02). "Social 2" used the same PLAAFP baseline data as the earlier social goal while providing new measurable annual goals. *Compare* Doc. 20-8 at 231 (AR 3197), *with id.* at 236 (AR 3202). But "Social 3" added an entirely new goal that referred to the Socially Savvy Survey in its PLAAFP baseline. *Id.* at 234 (AR 3200). And "Behavior 2" included the unsourced behaviors and percentages introduced in the prior draft as its PLAAFP baseline data. *Id.* at 235 (AR 3201). While these new revisions demonstrate that the IEP team included some new data when determining A.B.'s current levels, the bulk of the current IEP still presents outdated data without indicating "if the PLAAFP statements reflected any upward or downward trends from A.B.'s initial evaluations." Doc. 1-3 at 130 (Review Officer's Decision ¶ 136).

USD 512 responds to this dissonance, arguing that it "satisfied its obligation to consider the most recent evaluations by developing new and discontinuing old goals based on the collection of new data addressing A.B.'s current behavioral concerns[.]" Doc. 29 at 53. To support this position, the school district cites 34 C.F.R. § 300.324(a)(1)(iii), which provides that when "developing each child's IEP, the IEP Team must consider . . . [t]he results of the initial or most recent evaluation of the child[.]" USD 512 contends that one cannot properly treat the regulation's use of the word "consider" "to require specific evaluation data be expressly referenced in the PLAAFP or elsewhere in the IEP." Doc. 29 at 53.

USD 512 doesn't cite any authority to support its construction. But other courts have recognized the principle that the "purpose of present levels is to establish a baseline relative to which the teaching staff and IEP team may determine goals and objectives and against which they measure student progress." *W.-Linn Wilsonville Sch. Dist. v. Student*, No. 3:12-CV-02364-

ST, 2014 WL 3778571, at *14 (D. Or. July 30, 2014) (quotation cleaned up).  And these cases have held that the school district "bears the burden of demonstrating which evaluative materials were reviewed" when creating the IEP to ensure it's reasonably calculated to meet the unique needs of the child.  *S.B. ex rel. C.B. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1869, 2017 WL 4326502, at *11 (E.D.N.Y. Sept. 28, 2017).  Here, USD 512 doesn't demonstrate how the evaluation data from an earlier year helps reasonably calibrate the IEP to A.B.'s needs.  Nor does it show how the Review Officer erred by holding that the IEP "failed to fully take into consideration the results of the second evaluation, if at all, as there is no indication from reviewing the Current IEP that the second evaluation, FBA or BIP were incorporated into the PLAAFP, goals, objectives, or services."  Doc. 1-3 at 130 (Review Officer's Decision ¶ 138).

In particular, the Review Officer's Decision took note that the IEP included no reading goal, "even though A.B. [had] demonstrated no progress from his September 28, 2018 reading scores (qualifying for Tier 3, with a percentile rank of 17 percent) and December 2019 (again qualifying for Tier 3, with a percentile rank of 17 percent)."  *Id.* (Review Officer's Decision ¶ 139).  The Review Officer's Decision asserted that USD 512 "internally recognized that it lacked sufficient baseline information to evaluate the need for a reading goal, but nonetheless rejected Mrs. Beer's request for the same."  *Id.*  Kansas regulations require when "additional data is required to make . . . determinations" about present levels of academic achievement, the school district "shall administer those tests and evaluations that are appropriate to produce the needed data."  Kan. Admin. Regs. § 91-40-8(e)(1).  Here, USD 512 didn't administer those tests before rejecting the Beers' request for a reading goal.  Nor did it address those needs in the IEP once the data presented itself.

The court concludes that the record supports the Review Officer's holding that "the IEP was totally and completely based on information obtained during A.B.'s kindergarten year, some of which was obtained during the initial evaluation[,]" despite completing the final draft almost a semester into A.B.'s first grade year.  Doc. 1-3 at 130 (Review Officer's Decision ¶ 136).  Even though the IEP team altered and added some goals to the current IEP, it didn't clearly identify the source of the new data.  USD 512 doesn't meet its burden as the movant on this issue to show that the data it used corresponded to A.B.'s current levels at the time of the IEP's enactment.  All the goals relied on data from the previous school year.  And it rejected the Beers' request to include a reading goal despite not having proper data to do so.  Thus, the record supports the Review Officer's holding that the IEP's defects mean it "substantively violates the IDEA and does not confer a FAPE to A.B. in that it was not and is not reasonably calculated to enable A.B. to make progress appropriate considering his circumstances."  *Id.* at 132 (Review Officer's Decision ¶ 147).

### *Vague IEP Language*

The Tenth Circuit has recognized that IDEA and Kansas require an IEP to "specify the level of related services the District committed to provide[.]"  *O'Toole*, 144 F.3d at 707.  If an IEP relies on vague language when describing the services intended for a disabled child, it may deny that child a FAPE if it "'compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'"  *Id.* (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990)).  Here, the Review Officer held that USD 512 didn't address the vague terms in A.B.'s IEP after it recognized that those terms caused staff confusion.  Doc. 1-3 at 133 (Review Officer's Decision ¶ 155).  That confusion led staff to remove A.B. from the classroom

and, the Review Officer held, thus deprived him of a FAPE.  *Id.* (Review Officer's Decision ¶¶ 155–57).

USD 512 contends that the Review Officer made "no effort to describe how any vagueness in those terms compromised A.B.'s right to an appropriate education and fails to point to evidence in the record that supports his conclusions."  Doc. 29 at 59.  But the Review Officer's Decision explained in its factual findings the events that demonstrated confusion about A.B.'s IEP.  For instance, the Review Officer described how A.B. told his mother for the first time in January 2020 that he had left his classroom on multiple occasions during math lessons.  Doc. 1-3 at 91 (Review Officer's Decision ¶ 543).  Internal USD 512 emails admitted that school staff had failed to notify the Beers of A.B.'s removal because "'nothing was in writing'" telling them to do so.  *Id.* at 95 (Review Officer's Decision ¶ 566) (quoting Pet'rs' Ex. 273 (AR 3611)).  IDEA mandates, to "the maximum extent appropriate, [that] children with disabilities . . . are educated with children who are not disabled" and "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that" teachers can't provide a satisfactory education to the child.  20 U.S.C. § 1412(a)(5)(A); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982) (quoting § 1412(a)(5)).  KSDE's investigator concluded that allowing A.B. to leave the classroom amounted to a change in placement requiring parental consent, and that USD 512 hadn't provided the Beers with prior written notice before staff removed him from his classroom.  Doc. 1-3 at 99–100 (Review Officer's Decision ¶ 594(d)).

The Decision also discussed Natalie Beer's email exchange with Cindy Waeckerle, the special education teacher in A.B.'s school, who stated she "had no prior knowledge of A.B.'s leaving his general education classroom to come to her special education classroom[.]"  *Id.* at 92

(Review Officer's Decision ¶ 548). Waeckerle also signaled her agreement with Natalie Beer that, by January 2020, the IEP was "'no longer effective.'" *Id.* (Review Officer's Decision ¶ 547); *see also* Doc. 20-10 at 172 (AR 3658). The IEP team then met at the end of January 2020 to define some of the terms causing confusion, determine who needed to provide measurement data and write reports, and determine why staff had given A.B. the option to leave the classroom. Doc. 1-3 at 93 (Review Officer's Decision ¶¶ 551–53). The leaders of the IEP team also wanted to ensure that everyone knew how to respond to A.B.'s behavior and notify the Beers according to his behavior intervention plan (BIP). *Id.* (Review Officer's Decision ¶ 554). But, after the January 2020 meeting, USD 512's autism coach learned that staff hadn't contacted her for assistance "as they should" when they realized the motivation system in A.B.'s BIP didn't work. *Id.* at 94 (Review Officer's Decision ¶ 560). The KSDE investigator later concluded that the "parties did not have a 'meeting of the minds' regarding the definitions of a 'break' and 'choices.'" *Id.* at 100 (Review Officer's Decision ¶ 594(e)).

The Review Officer enumerated the evidence in the record that the school's IEP team not only created an IEP using vague language, but also became aware of the vagueness as it rendered the interventions ineffective. Just because a school deviates sporadically from a student's IEP doesn't necessarily mean that the IEP clearly had violated IDEA. *L.C. ex rel. N.C. v. Utah State Bd. of Educ.*, 125 F. App'x 252, 260 (10th Cir. 2005). But the Review Officer noted the pattern of confusion among staff created by the vague language in A.B.'s IEP. That vague language led staff to remove A.B. from class, contradicting IDEA's preference for keeping students with disabilities in the same educational environment as those without disabilities. *See* Doc. 1-3 at 133, 134 (Review Officer's Decision ¶¶ 155, 158); *see also* 20 U.S.C. § 1412(a)(5)(A); *Rowley*, 458 U.S. at 181. The vague IEP also led staff to fail to communicate with the Beers, preventing

them from meaningfully participating in the IEP process and its implementation. Doc. 1-3 at 134 (Review Officer's Decision ¶ 158). USD 512 recognized that the IEP's vague terms created issues, but it "failed to take necessary steps . . . to define those terms and failed to propose definitions to A.B.'s parents despite committing to do so." *Id.* at 133 (Review Officer's Decision ¶ 155). Thus, the record supports the Review Officer's conclusion that the vague terms in the IEP contributed to USD 512 denying A.B. a FAPE.

*Implementing the IEP*

Finally, the Review Officer held that USD 512 "committed both a procedural and substantive IDEA violation" depriving A.B. "of an IEP that adequately tracked his goal progression, and deprived A.B. of [an] educational benefit." *Id.* at 135 (Review Officer's Decision ¶ 163). Specifically, the Review Officer's Decision concluded that USD 512 provided "conclusory progress reporting to [the Beers] that was inconsistent with goal progression data collected by the [USD 512]," and failed to provide that data when the Beers requested it. *Id.* Also, the Review Officer's Decision held, these "material failures" occurred "because [USD 512] failed to implement a significant proportion of services," preventing A.B. from progressing toward his goals. *Id.* (Review Officer's Decision ¶ 164). USD 512 counters, arguing that it adequately monitored A.B.'s progress, and in any event the Review Officer's finding that USD 512 failed to track one of A.B.'s goals adequately is too minor to have denied A.B. a FAPE. Doc. 29 at 60–62.

The meaning of "appropriate progress" for a student under an IEP will vary from case to case, since an IEP's adequacy "turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 580 U.S. at 404. But a school district can't simply "ignore the fact that an IEP is clearly failing[.]" *O'Toole*, 144 F.3d at 702. School districts incur liability when "a

*material* failure to implement an IEP violates the IDEA." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). The party challenging an IEP's implementation must demonstrate more than a *de minimis* failure by showing the school district failed to implement substantial or significant parts of the IEP. *See E.C. v. U.S.D. 385 Andover*, No. 18-1106-EFM, 2020 WL 2747222, at *6 (D. Kan. May 27, 2020) (citations omitted). Once a party meets that standard, the "reviewing court may fairly expect [school] authorities to be able to offer a cogent and responsive explanation for their decisions[.]" *Endrew F.*, 580 U.S. at 404.

The Review Officer here determined that USD 512 "failed to implement a significant proportion of services" listed in A.B.'s IEP. Doc. 1-3 at 135 (Review Officer's Decision ¶ 164). These failures included the school district failing to provide the Beers with data collection sheets after they had requested them. *Id.* (Review Officer's Decision ¶ 163). USD 512 argues that the Review Officer's decision doesn't make a finding that it failed to provide the data collection sheets. Doc. 29 at 62. It counters that "the administrative record reflects not only that [USD 512] has reported A.B.'s progress to [the Beers], but also that [USD 512's] IEP team members have collaborated with Mrs. Beer and discussed progress reports[.]" *Id.*

But in so arguing, USD 512 misses the point of the Review Officer's holding. The Review Officer held that the progress reports contained "conclusory progress reporting . . . that was inconsistent with goal progression data collected" by USD 512. Doc. 1-3 at 135 (Review Officer's Decision ¶ 163). To support this finding, the Review Officer cited testimony demonstrating that A.B.'s "push-in" support person collected data in his progress sheets during the 50-minute intervals when she visited him in his morning class. *Id.* at 98 (Review Officer's Decision ¶¶ 584–85). The record doesn't demonstrate that the progress report used data from any observations other than those provided by A.B.'s support person. Waeckerle testified at the

hearing that she had concerns about the method A.B.'s support person used to collect data. Doc. 20-15 at 971–72 (Tr. Vol. IV 832:23–833:3); *see also* Doc. 1-3 at 98 (Review Officer's Decision ¶ 588). The record demonstrates why she had those concerns.

The IEP team assigned data collection responsibility for A.B.'s progress reporting to his support person, who only saw A.B. for 50 minutes each morning, and in a limited setting. This scarcity of data, resulting in conclusory progress reports based on a limited sample, aligns with Waeckerle's testimony that she had concerns that the collected data was insufficient. Doc. 20-15 at 970–972 (Tr. Vol. IV 831:3–833:3). On those sheets for A.B.'s Social "Measurable Annual Goal 5," the data collection used a 1–3 scale for rating whether A.B. could identify emotions in himself, could identify emotions in others, could identify a calming strategy, and could apply a calming strategy. Doc. 1-3 at 97–98 (Review Officer's Decision ¶¶ 582–83); *see also* Doc. 20-9 at 39–69 (AR 3312–42). A.B. received mostly scores of "1" for "Did not meet expectations" in three of those categories, including all "1"s in identifying a calming strategy, and eight "1"s and one "2" ("some expectations met") for using a calming strategy. *Id.* For the fourth category—identifying emotions in others—the data sheets reflected no scores at all. *Id.* at 97 (Review Officer's Decision ¶ 583(b)).

Despite these scores, A.B.'s progress report conlcuded, "A.B. is able to identify the emotion in himself, identify the emotion in others, identify a calming strategy, and use a calming strategy 53% of the time on observed data days." *Id.* (Review Officer's Decision ¶ 582); *see also* Doc. 20-11 at 1 (AR 3668). The progress report also noted "Adequate Progress" on that goal as of March 13, 2020. Doc. 20-11 at 1 (AR 3668). Waeckerle testified she couldn't understand how the support person calculated the 53% figure from her data collection. Doc. 20-15 at 969 (Tr. Vol. IV 830:6–12); *see also* Doc. 1-3 at 98 (Review Officer's Decision ¶ 588).

Even though the record demonstrates USD 512 provided the progress reports to the Beers, there's no evidence that it provided the data collection sheets.  Without receiving the data collection sheets they had requested, the Beers couldn't discern these discrepancies.  This kind of failure deprives parents the opportunity "to examine all records relating to [their] child . . . with respect to . . . the provision of a free appropriate public education[.]"  20 U.S.C. § 1415(b)(1).

Two other goals—"Measurable Annual Goal 4" and "Measurable Annual Goal 6"—also relied on data collected by A.B.'s support person.  *See* Doc. 20-10 at 180–181 (AR 3666–67); Doc. 20-11 at 1–2 (AR 3668–69).  On Measurable Annual Goal 4, the progress report concluded that A.B. "is able to interact appropriately with his peers 90% of the time on the days observed." Doc. 20-10 at 181 (AR 3667).  The data from these collection sheets better supports this statistical assertion than did the sheets for Goal 5.  *See* Doc. 20-9 at 39–69 (AR 3312–42).  But when one examines the data collection closely, those sheets don't contain more than four individual data points for any of Goal 4's four objectives.  *Id.*  And, for Objective 3—measuring how well A.B. engages in appropriate turn-taking—the support person recorded a score just one time.  *Id.*  Such meager data could skew the results drastically and fail to provide an adequate picture.  Without access to this underlying data, the Beers were deprived of the opportunity to participate meaningfully in the process.

The record also charts why Waeckerle's concerns extend beyond the progress reports.  At other points during the first few months of implementing A.B.'s IEP, Waeckerle had signaled concerns that the IEP wasn't working.  She suggested that she believed A.B. needed a reading goal.  Doc. 1-3 at 90 (Review Officer's Decision ¶¶ 533–34).  Also, she told staff that A.B. was continuing to refuse doing work.  *Id.* at 89–90 (Review Officer's Decision ¶ 528).  Waeckerle expressed concern that the reward system in A.B.'s BIP had failed to produce results.  *Id.* at 92

(Review Officer's Decision ¶ 545).  And she agreed with Natalie Beer that the "current

plan . . . seem[s] no longer effective."  Doc. 20-10 at 172 (AR 3658).  Waeckerle developed

multiple concerns about A.B.'s IEP and its adequacy, and she voiced those concerns among the

staff.  At no point did USD 512 revisit the IEP, its goals, or how it collected data to address those

concerns.

The record also provides evidence that USD 512 inadequately implemented the IEP it

created for A.B.  In late January 2020, Jill Koertner, USD 512's autism coach, asked staff to

complete a chart showing which portions of A.B.'s BIP they had implemented.  Doc. 20-10 at

167 (AR 3653).  A.B.'s support person completed the chart the following day.  *Id.* at 167–70

(AR 3653–56).  The record doesn't contain a copy of the sheet completed by any other teacher or

staff member.  Of the 15 interventions, the support person reported that she had implemented

nine and partially implemented six.  *Id.*  Some interventions achieved partial implementation

only because A.B.'s support person only knew that she implemented them in the morning when

she saw him.  The support person didn't know if A.B.'s other teachers did the same, but knew

some behaviors surfaced more frequently in the afternoons.[13]  *Id.* at 168–69 (AR 3654–55).

Also, the support person reported that she, at most, partially had implemented A.B.'s

motivational system because it wasn't used consistently.  *Id.* at 170 (AR 3656); *but see id.* at 162

(AR 3648) (email from Waeckerle to staff stating her belief that A.B.'s motivation system isn't

working).  Koertner testified that if staff implement a BIP "for two or three weeks and it's not

[working]," then the staff "can take a look at it and then change [the] plan if it's not working."

Doc. 20-15 at 1425 (Tr. Vol. V 1232:11–21).  USD 512 doesn't address the staff's inconsistency

---

[13]     Also, A.B.'s support person marked that she had fully implemented one intervention, even though the
corresponding behavior hadn't occurred since students returned from break.  Doc. 20-10 at 170 (AR 3656).

when it implemented A.B.'s BIP, or why staff didn't make changes when they discovered it wasn't working.

This evidence from internal school district communication and the hearing record supports the Review Officer's finding that USD 512 failed to track A.B.'s goal progression adequately, failed "to implement a significant proportion" of A.B.'s IEP and BIP, and failed to correct it when they recognized any inadequacies.  Doc. 1-3 at 135 (Review Officer's Decision ¶ 164).

After reviewing the record independently, the court finds support for the Review Officer's finding that USD 512 failed to develop, implement, and monitor A.B.'s IEP, thus denying him a FAPE.  The goals in the IEP relied on outdated data that didn't reflect A.B.'s current levels.  The IEP employed vague language that caused confusion among staff and led to A.B.'s removal from the classroom without his parents' consent.  USD 512 failed to implement A.B.'s IEP and BIP, and it didn't attempt to modify them when staff identified their shortcomings.  And USD 512 failed to measure A.B.'s progress adequately or provide the Beers with the underlying data.  These failures "prevented [the Beers] from meaningful participation in A.B.'s IEP, substantively harmed A.B. by depriving him of an IEP that adequately tracked his goal progression, and deprived A.B. of [an] educational benefit[,]" thus denying A.B. a FAPE. *Id.* (Review Officer's Decision ¶ 163).

### 5.  Conclusion[14]

The Review Officer's Decision held that USD 512 had violated IDEA by failing to complete its evaluation of A.B. within the required time period, failing to develop an adequate IEP, and failing to implement that IEP.  USD 512 has contested these rulings.  After reviewing

---

[14]     The court defers its analysis of the parties' arguments about the remedies awarded during the administrative proceedings to later in this Order.  *See, e.g., infra* at 64–83 (Part III.C.).

the record independently, the court concludes that the evidence adequately supports the Review

Officer's Decision that USD 512 denied A.B. a FAPE.  The school district failed to complete its

evaluation within the statutory time period or secure parental consent to extend it.  The resulting

IEP incorporated outdated data to formulate its goals.  And its progress monitoring mechanisms

produced conclusory reports relying on insufficient data, while not providing the Beers with the

underlying data.  These actions delayed A.B.'s receipt of an IEP, prevented the Beers from

meaningfully participating in the process, and deprived A.B. of an IEP "reasonably calculated to

enable [him] to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 580

U.S. at 403.

 In contrast, the court also agrees with USD 512 that the Hearing Officer and Review

Officer impermissibly considered the issue of A.B.'s fine motor skills, since the Beers never

raised this issue in their due process complaint.  Thus, the court doesn't consider the fine motor

skills issue when deciding appropriate compensatory relief for USD 512's manifold failures.

## B.  Beer Family Argument (in 21-cv-2608)[15]

 The court now turns to the lone challenge the Beers make to the Review Officer's rulings.

The Beers contend that the Review Officer erred by concluding that USD 512 met its "child

find" obligations.  Instead, they argue, USD 512 violated IDEA and Kansas's child find

procedures for identifying, locating, and evaluating children with disabilities in both the 2018–19

and 2019–20 school years.  Doc. 25 at 56–72.  They maintain that USD 512 conducted flawed

FBA and social skills assessments, that it tried to avoid providing A.B. services by not

---

[15] All citations to court filings in Part III.B. refer to the docket for and filings in Case No. 21-cv-2608-DDC-TJJ, unless otherwise noted.

identifying him under the "autism" category, and that it unilaterally ceased A.B.'s evaluation in February 2019.[16]  *Id.*

Each state maintains an affirmative duty to ensure that "[a]ll children with disabilities residing in the State . . . are identified, located, and evaluated[.]"  20 U.S.C. § 1412(a)(3)(A). The state also must develop and implement "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services."  *Id.*; *see also* 34 C.F.R. § 300.111(a).  Kansas law requires school districts to have policies and procedures that "include age-appropriate screening procedures" consisting of "observations, measures, and techniques that disclose any potential exceptionality and indicate a need for evaluation[.]"  Kan. Admin. Regs. § 91-40-7(b).

For school districts, "the child find duty is triggered when the school district has reasonable suspicion to believe that a student is a 'child with a disability.'"  *D.T. ex rel. Yasiris T. v. Cherry Creek Sch. Dist. No. 5*, 55 F.4th 1268, 1274 (10th Cir. 2022) (citations omitted). When discharging its child find duty, a school district "must act 'within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability.'"  *Id.* (quoting *D.K. ex rel. Stephen K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012)).  Whether a school district has violated its child find duty depends on three factors:  "(1) the date the child find requirement triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates."  *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 793 (5th Cir. 2020) (citation

---

[16]     The Beers also argue that the Review Officer erred by holding that USD 512 satisfied its child find duties even though it refused to evaluate A.B.'s fine motor skills.  Doc. 25 at 72–74.  But the court already has held that the issue of A.B.'s fine motor skills shouldn't factor into its analysis of USD 512's obligations under IDEA.  *See supra* at 40–44 (Part III.A.4.b.i.).  Since the Beers impermissibly introduced the fine motor skills issue, the court declines to consider this argument.

omitted).  A school district satisfies its child find obligation when it begins the eligibility

evaluation process upon a parent's request and secures informed parental consent.  *See, e.g.*, *id.*

(holding that "referral for evaluation represents the appropriate end date for the reasonableness

inquiry"); *Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1196 (11th Cir. 2018) (holding the

school district "satisfied its child-find duty by initiating the IDEA-eligibility process at the

[parents'] request"); *see also* Kan. Admin. Regs. § 91-40-7(c) (child find requirements stating

that a school district "may refer a child . . . for an evaluation if . . . [t]he parent of the child

requests, and gives written consent for, an evaluation of the child, and the board agrees that an

evaluation of the child is appropriate").

   The Review Officer held that, during the 2018–19 school year, the Beers' request for an

evaluation of A.B. triggered USD 512's child find obligations on August 29, 2018.  Doc. 1-3 at

117 (Review Officer's Decision ¶ 68).  A week later, USD 512 received written consent from the

Beers to evaluate A.B. to determine if he met eligibility requirements for special education

services.  *Id.* (Review Officer's Decision ¶ 69).  Based on this timeline, the Review Officer

found that USD 512 "responded to the parent's request, obtained consent [from] the parent, and

initiated the evaluation."  *Id.* (Review Officer's Decision ¶ 71).  The court affirms the Review

Officer's conclusion that the Beers, for the 2018–19 academic year, haven't "proven that [USD

512] failed to meet its child find obligations[.]"  *Id.* (Review Officer's Decision ¶ 72).

   The Review Officer didn't rule on USD 512's child find obligations for the 2019–20

academic year.  His Decision appears to determine that, once USD 512 met its child find

obligations for 2018–19 and began evaluating A.B., it had satisfied those obligations for the

following year since the evaluation remained ongoing.  But the Beers argue that the Review

Officer erred by not concluding that USD 512 violated its child find obligations for the 2019–20

academic year.  Though the court agrees with the Review Officer's holding, it concludes that even if USD 512's child find obligations renewed at the start of the 2019–20 school year, the Beers' argument fails for the same reasons already expressed.  Specifically, on August 2, 2019, Natalie Beer emailed Jennifer Dancer, USD 512's assistant director of special education, to ask for a meeting before the school year began.  *Id.* at 72 (Review Officer's Decision ¶ 402).  Dancer met with Natalie Beer six days later.  *Id.* (Review Officer's Decision ¶ 407).  On August 13, the Beers sent signed consent to the school district in order to recommence A.B.'s evaluation process.  *Id.* at 73–74 (Review Officer's Decision ¶ 416).  This sequence of events followed a similar pattern similar to the timeline for the 2018–19 school year, *i.e.*, one where USD 512 quickly responded to the parent, gained consent, and began the evaluation process (albeit from where it left off the previous spring).  Thus, for the same reasons, the court concludes that USD 512 met its child find obligations for the 2019–20 school year.

The Beers' arguments conflate USD 512's child find obligations with the eligibility evaluation requirements.  The court already has discussed USD 512's failure to complete a timely evaluation.  *See supra* at 21–32 (Part III.A.3. (holding that USD 512 procedurally and substantively violated IDEA by not timely evaluating A.B. and depriving him of a FAPE)).  The Review Officer noted that USD 512's insufficient evaluation process "does not detract from the fact that [USD 512] took steps required to identify, locate, and evaluate A.B. within a reasonable time once made aware of the possibility of a disability that may need special education."  *Id.* at 117 (Review Officer's Decision ¶ 72).

The evaluation requirement represents a separate obligation, distinct from a school district's child find obligations.  *Compare* Kan. Admin. Regs. § 91-40-8, *and* Kan. Admin. Regs. § 91-40-9, *with* Kan. Admin. Regs. § 91-40-7.  The child find process under the Kansas

Regulations requires a school district "to identify, locate, and evaluate all children with exceptionalities residing in its jurisdiction[.]" Kan. Admin. Regs. § 91-40-7(a). The regulation also allows a school district to "refer a child who is enrolled in public school for an evaluation" under certain conditions. Kan. Admin. Regs. § 91-40-7(c).

None of the rules applying to Kansas's child find regulation discuss the content or methods of evaluation. *Id.* The rules governing those procedures instead originate in Kan. Admin Regs. §§ 91-40-8 and 91-40-9, which provide detail about what a school district must do when it refers a child for evaluation and acquires informed parental consent. In Kansas, a school district's child find obligation focuses on the events *before* the evaluation process and the events *leading to* that evaluation process. *See D.T.*, 55 F.4th at 1274 ("When a disability is found, IEP or individual services assessment commences." (citing 20 U.S.C. § 1412(a)(4))). Thus, the Beers' arguments that USD 512 violated child find because the IEP team conducted a flawed FBA, tried not to classify A.B. under the "autism" disability,[17] and unilaterally ceased its evaluation in February 2019 don't persuade the court that the Review Officer erred in his Decision. The court affirms the Review Officer's holding that USD 512 met its child find obligations under IDEA and Kansas statutes. Adequate evidence supports that finding and the Beers' arguments in their action don't identify any error.

---

[17] The Beers' argument that USD 512 tried not to classify A.B. under "autism" to avoid providing him services doesn't comport with the statutory requirements, either. Under IDEA's child find requirements, nothing in the statute "requires that children be classified by their disability so long as each child who has a disability listed in . . . this title and who, by reason of that disability, needs special education and related services is regarded as a child with a disability[.]" 20 U.S.C. § 1412(a)(3)(B). Whether the evaluation classified A.B. under "autism" or "other health impairment," IDEA required USD 512 to provide him services.

### C.  Compensatory Damages (in 21-cv-2604 and -2608)[18]

IDEA provides that a district court, upon reviewing the administrative record, and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  This provision "confers broad discretion on the court."  *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).  But the relief provided "is to be 'appropriate' in light of the purpose of the Act."  *Id.*  Congress passed IDEA to provide disabled children "with a free appropriate public education which emphasizes special education and related services designed to meet their unique needs."  *Id.* (quotation cleaned up).

The Hearing Officer's Decision in July 2021 contained no mention of compensatory relief.  *See* Doc. 1-1 (Hr'g Officer's Decision).  The Hearing Officer authorized the Beers, however, to file a Motion for Reconsideration of Remedies and issued his Supplemental Decision & Award in August 2021.  The Review Officer's Decision held that the Hearing Officer's reconsideration and supplemental decision "was outside of the process established for these types of hearings" as permitted under Kan. Stat. Ann. § 72-3416(h).  Doc. 1-3 at 139 (Review Officer's Decision).  The Review Officer then issued an independent decision awarding compensatory damages based on his review of the record.  *Id.*  In his Decision, the Review Officer held that USD 512 "shall implement the following" remedies:

1. Independent Education Evaluation:

    a) [USD 512] shall enter into a contract with an individual to conduct an Independent Education Evaluation [(IEE)] of A.B. to assist in meeting A.B.'s current educational needs and to assist in promoting A.B.'s educational progress.

---

[18]     All citations to court filings in Part III.C. refer to the docket for and filings in Case No. 21-cv-2604-DDC-TJJ, unless otherwise noted.

b) The search for an individual to conduct the IEE shall be commenced by [USD 512] within twenty (20) days of this Decision and Award.

c) The individual contracted to conduct the Individual Education Evaluation shall have the following minimum qualifications:

   i. Possess an active, Kansas conferred Special Education Teaching License in good standing.

   ii. Have no less than three (3) years of Special Education evaluation experience.

   iii. Have no less than three (3) years of previous experience working in a school setting with students with Autism Spectrum Disorder.

d) [USD 512] shall act in good faith to permit the parents full participation in the selection process for the independent special educational evaluator. Following consultation with the Parents, it is the responsibility of [USD 512] to make the final selection of the individual to conduct the evaluation. [USD 512 shall] pay all costs associated with the IEE.

e) Within twenty-one (21) days after the final IEE is complete and in conjunction with the Independent [Board-Certified Behavior Analyst (BCBA)], the [Individualized Education Program (IEP)] Team shall convene to develop a new IEP for A.B. The IEP shall consider whether the IEP should include at least 60 minutes of additional paraprofessional support in the afternoon, a reading goal, social pragmatic goal, a new behavior reduction goal, behavior goals that focus on increasing prosocial replacement and reduce problematic behavior, and a clear and descriptive Behavior Intervention Plan (BIP) as developed by the Independent BCBA and [Functional Behavior Assessment (FBA)]. The IEP shall include additional services, goals, and other provisions as determined necessary by the IEP Team, in consultation with the evaluators and the Parents. The IEP shall also include any and all OT services to address A.B.'s fine motor skills as recommended through the completion of an independent OT evaluation.

2. Special Education IEP Specialist.

a) [USD 512] shall contract with an independent Special Education IEP specialist to help ensure that the IEP for A.B. is developed to meet A.B.'s current educational needs and to help A.B. make educational progress.

b) The search for the IEP specialist shall commence within twenty (20) days of this Decision and Award.

c) The IEP specialist shall have the following qualifications:

    i. Possesses an active, state conferred special education teaching license in good standing.

    ii. Have no less than three (3) years of special education administrative experience[.]

    iii. Have no less than three (3) years of experience in conducting IEP meetings, ensuring [USD 512's] completion of progress reports and all legally required documentation.

d) [USD 512] shall act in good faith to permit the Parents full participation in the selection process for the independent special education IEP specialist. Following consultation with the Parents, it is the responsibility of [USD 512] to make the final selection of the Specialist Education IEP Specialist.

e) This position shall be contracted for the remainder of 2021–2022 school year and continue through the 2022–2023 school year, including school-based extended school year services during the summer of 2022.

f) [USD 512] is responsible for ensuring that the contractual agreement with the special education IEP specialist satisfactorily reflects the scope of the above responsibilities and obligations.

3. Board-Certified Behavior Analyst (BCBA).

a) [USD 512] shall contract with an independent Board-Certified Behavior Analyst (BCBA) to complete an FBA of A.B.

b) The search for the BCBA by [USD 512] shall commence within twenty (20) days of this Decision and Award.

c) This position shall be procured for the remainder of the 2021–2022 school year and continue through the 2022–2023 [school year], including school-based extended school year services during the summer of 2022.

d) The BCBA must have held this credential for a minimum of three consecutive years and have previous experience working in the school setting with students who [have] Autism Spectrum Disorder for a minimum of 3 consecutive years. [The] BCBA must provide a copy of the BCBA certificate and be in good standing with the ethical and professional standards set forth by the Behavior Analyst Certified Board.

e) [USD 512] shall act in good faith to permit the Parents full participation in the selection process for the BCBA. Following consultation with the Parents, it is the responsibility of [USD 512] to make the final selection of the BCBA.

f) The contracted BCBA shall:

i. Provide behavior analytic services for A.B. throughout all school settings during virtual and face-to-face instruction,

ii. Conduct a complete direct observation that includes a minimum of 3 hours across multiple sessions of direct observation in the course room(s) where A.B. is receiving his remote instruction.  The Functional Behavior Assessment conducted by the independent BCBA shall also include A-B-C data collected during the 3 hours of direct observation, a completed Motivation Assessment Scale (Durand & Crimmins, 1992) by Mr. Beer, Mrs. Beer, the BCBA and A.B.['s] teacher and a VB-MAPP completed by the BCBA.  A separate Motivation Assessment Scale shall be completed for each identified target behavior by each person identified above.  [USD 512] will be responsible for obtaining the Motivation Assessment Scale through a legitimate vendor.  A xeroxed copy of the Motivation Assessment Scales must not be provided to the individuals completing this scale.  [USD 512] will provide the BCBA with a purchased VBMAPP Guide and Protocol.  [USD 512] will deliver these assessment tools to the BCBA within a sufficient timeframe for the completion of the FBA.  The FBA shall also summarize the results for a preference assessment in order to identify A.B.['s] motivational preferences.

iii. Conduct direct observations during school sessions.

iv. It is recommended that [t]he FBA report developed by the independent BCBA be submitted to [USD 512] no later than three (3) weeks after the start date of the contractual agreement between these parties.

v. The BCBA will present the findings of the FBA, either in person or through remote video conferencing as applicable due to COVID-19, to the IEP team within two (2) weeks of submitting the FBA to [USD 512]'s Director of Special Education.  All relevant District staff, the parents and the contracted IEP Specialist must be invited and in attendance to this IEP team meeting.

vi. The IEP Team, including relevant staff from District, the parents, the contracted BCBA and IEP Specialist shall reconvene within three (3) weeks after the FBA review meeting to review the BIP.

vii. The BCBA will oversee the implementation of the BIP across all school settings, either in-person and/or during remote learning sessions.

viii. The BCBA will develop materials for [USD 512] staff training, parent training on the implementation of the BIP.  [USD 512] shall assume the cost of all materials.

ix. The independent BCBA shall provide twenty-five (25) hours of compensatory in-home ABA services for A.B. during the 2021–2022

school year, at the expense of [USD 512]. The scope of these services is to assist the parents with the implementation of evidence[ ]-based behavior analytic strategies to be determined by the independent BCBA.

4. Educational Tutor:

a) [USD 512] shall contract with an educational tutor to provide twenty-five (25) hours of in-home compensatory educational tutoring for each of the 2021–2022 and 2022–2023 school years.

b) [USD 512] shall hire an educational tutor who possesses an active Kansas Special Education teacher license and three (3) years of experience in teaching young children with autism to provide in-home educational tutoring which aligns with A.B.['s] IEP.

c) Tutoring services shall commence within three (3) weeks of the date of this Decision and Award.

5. Additional Requirements:

[USD 512] shall provide the following:

a) Reimburse Petitioners $2,280 for special education advocate expenses incurred by the Petitioner in enforcing the IDEA

b) Reimburse the Petitioner $1,462.12 for A.B.'s private placement in Riley ABA to make up for the lost educational benefits because of [USD 512's] delay in completing the evaluation and implementing an IEP.

c) Reimburse the Petitioner $1,840 for the private evaluation by Dr. Ostmeyer to determine A.B.'s present levels.

d) Provide quarterly progress reports that identify the observing staff, and that attach copies of all underlying data collection.

Doc. 1-3 at 142–46 (Review Officer's Decision).

Now, USD 512 attacks the Review Officer's award. It claims that he didn't "correlate these 'remedies' to an educational deficit resulting from a denial of FAPE." Doc. 29 at 63. In contrast, the Beers contend that the Review Officer erred by reducing the compensatory education awarded by the Hearing Officer's Supplemental Decision and by using unclear language to express the award. Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 49–56. The court

analyzes the parties' arguments about compensatory relief, below.  But first, the court addresses some preliminary matters concerning the Review Officer's Decision and the award it provided.

### 1.  The Review Officer's Award Decision

In deciding to vacate the Hearing Officer's Supplemental Decision, the Review Officer cited a specific Kansas statute, holding that it prohibits the Supplemental Decision.  Doc. 1-3 at 139 (Review Officer's Decision).  Kan. Stat. Ann. § 72-3416 prescribes the process for a due process hearing.  This statute provides that when "a hearing officer conducts any hearing, such hearing officer shall render a decision on the matter," and that any decision from that hearing "shall be final, subject to appeal and review in accordance with this act."  Kan. Stat. Ann. § 72-3416(h).  The Review Officer interpreted that provision to hold that a hearing officer may not issue an order reconsidering his own decision since "there is no provision within the Kansas Special Education for Exceptional Children Act (KSEECA) for a party to petition for or request reconsideration of a [Hearing Officer's] final decision."  Doc. 1-3 at 139 (Review Officer's Decision).

The court agrees with the Review Officer.  The Hearing Officer's Supplemental Decision exceeded the scope of his authority.  Unlike a district court, where the Federal Rules of Civil Procedure explicitly allow the court to revisit a final judgment or order, *see, e.g.*, Fed. R. Civ. P. 60 (allowing parties to move for relief from a final judgment), the statutes governing special education due process hearings provide no such process.  Kan. Stat. Ann. § 72-3416(h) only allows for "appeal and review in accordance with" the special education statutes.  That appeal and review process allows parties to appeal the decision to a review officer and, then, to appeal that review officer's decision to the court.  Kan. Stat. Ann. § 72-3418(b)–(c).  Because the statute doesn't establish or recognize the authority for parties to seek reconsideration, the Hearing

Officer's Supplemental Decision doesn't comport with the statutorily authorized procedures. The court thus affirms the Review Officer's decision to vacate the Hearing Officer's award.

On another issue, the Review Officer's Decision awarding compensatory damages considered USD 512's failure to consider A.B.'s deficient fine motor skills.  Doc. 1-3 at 141 (Review Officer's Decision).  The Review Officer's Decision directed that A.B.'s "IEP shall also include any and all OT services to address A.B.'s fine motor skills as recommended through the completion of an independent OT evaluation."  *Id.* at 142–43 (Review Officer's Decision ¶ 1(e)). As the court has addressed, *see supra* at 40–44 (Part III.A.4.b.i.), the Beers improperly introduced the issue of A.B.'s fine motor skills.  Since the Beers failed to preserve this issue, the Review Officer's Decision erred by including this issue in its compensatory award.

### 2.  *Parties' Challenges to the Compensatory Award*

USD 512 advances a series of arguments why, it believes, the Review Officer's compensatory award to the Beers doesn't correspond to findings of lost educational benefits. Specifically, it contends that the Review Officer's Decision lacks legal justification for (1) reimbursement for instruction at Riley ABA and Autism Center, the private education and therapy facility where the Beers sent A.B. during summer 2019; (2) compensatory education; and (3) other specific remedies.  Doc. 29 at 62–72.  In contrast, the Beers argue that the Review Officer awarded too little.  They contend he reduced the compensatory education award without justification and, separately, used vague language that doesn't provide adequate relief.  Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 49–56.  The court addresses each of these arguments, below.

### a.  *Reimbursement for Riley ABA Instruction*

In general, IDEA doesn't require a school district to pay for "special education and related services[ ] of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child

in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i). But the court "may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* § 1412(a)(10)(C)(ii). When interpreting these provisions in IDEA, the Supreme Court has held that the statute "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009). Whether a private school placement is appropriate turns on whether "the education provided by the private school is reasonably calculated to enable the child to receive educational benefits." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 11 (1993) (quotation cleaned up).

Here, the Review Officer held—and the court now affirms—that USD 512 denied A.B. a FAPE when it procedurally and substantively violated its evaluation requirements under IDEA. *See supra* at 21–32 (Part III.A.3.). Because USD 512 failed to provide a FAPE, the reimbursement provision should apply to the Beers for seeking instruction at Riley ABA. But USD 512 argues that the private school's "placement and services selected by the parent . . . must address the student's needs and provide [him] with [an] educational benefit." Doc. 29 at 64 (citing *Florence Cnty.*, 510 U.S. at 11). USD 512 contends that the record lacks "evidence that Riley ABA provided an educational benefit to A.B."[19] *Id.* at 65. The court disagrees.

---

[19]     USD 512 also argues that the record lacks evidence that Riley ABA "was A.B.'s least restrictive environment." Doc. 29 at 65. But it provides no legal authority requiring this kind of finding, and the court's research locates no authority directing the court to apply such a standard when considering reimbursement for parent-initiated private school enrollment under 20 U.S.C. § 1412(a)(10)(C). USD 512 also appears to have

When A.B. attended Riley ABA during summer 2019, the staff evaluated him to determine his current levels in several respects.  Doc. 1-3 at 70 (Review Officer's Decision ¶ 395); *see also* Doc. 20-15 at 611–613 (Tr. Vol. III 526:25–528:7); Doc. 20-11 at 108–12 (AR 3775–79).  The Riley staff worked with A.B. in several dimensions that bear a substantive connection to subjects that the IEP team later included as objectives in A.B.'s IEP.

For instance, the staff at Riley, in their evaluation of A.B. proposed goals that "[A.B] will follow one and two step auditory directions directed at a group," "[A.B.] will look and judge if it is OK to start/continue a social engagement with others by their body language and eye gaze," "[A.B.] will walk up to a peer and/or adult to greet them with 1–2 seconds of eye contact and a verbal greeting," and "[A.B.] will ask a peer to play their choice of activity/game[.]"  Doc 20-11 at 110–11 (AR 3777–78).  These individual goals correspond to objectives listed in A.B.'s IEP months later:  "[A.B.] will demonstrate the following on-task behaviors: . . . following the directions given[,]" "[i]dentifying various emotional states in others and why he/she might be feeling a particular emotion[,]" "[i]dentifying appropriate social rules and codes of conduct for various social situations[,]" "[e]ngaging in cooperative social interactions[,]" and "[e]ngaging in appropriate social play[.]"  Doc. 20-8 at 234–36 (AR 3200–02).  Also, the broader categories of attention, greetings, social play, and social communication created by Riley ABA correspond to the broad social, communication, and behavior goals in A.B.'s IEP.  *Compare* Doc. 20-11 at 110–12 (AR 3777–79), *with* Doc. 20-8 at 231–36 (AR 3197–202).  While not all of the issues that A.B. addressed at Riley correspond to those in his IEP, the two programs share significant common features.  If anything, the goals created by Riley are more specific, and are measured more easily than those in A.B.'s IEP.  This characteristic demonstrates that the instruction A.B.

---

abandoned this argument in its Reply.  *See* Doc. 40 at 30–32.  The court thus declines to address this argument in any detail.

received from Riley ABA was reasonably calculated to provide him with an educational benefit. Thus, the court affirms the Review Officer's holding that the private instruction at Riley ABA was appropriate.

USD 512 also contends that "the justification for the [reimbursement] overlooks that when A.B. attended Riley ABA [USD 512] could not legally provide A.B. with special education." Doc. 29 at 65. While it's true that the Beers hadn't provided written consent for special education or related services by summer 2019, the Supreme Court's holding in *Forest Grove* means it doesn't matter "whether the child previously received special education or related services through the public school." 557 U.S. at 247. Instead, the controlling issue is whether USD 512 had denied A.B. a FAPE when his parents sought out private instruction. *See id.* The court already has affirmed the conclusion that USD 512 had denied A.B. a FAPE by summer 2019. Thus, the Review Officer's award to the Beers of reimbursement for the costs of enrolling A.B. at Riley ABA in May 2019 is appropriate under this timeline.

### b.  Compensatory Education

When a court awards compensatory education, such an award "vindicates the student's *substantive* right to receive a FAPE and compensates for a past deprivation of educational opportunity rather than a deprivation of purely procedural rights." *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (quotation cleaned up). On the other hand, "compensatory education is not an appropriate remedy for a procedural violation of the IDEA." *Erickson ex rel. Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1122–23 (10th Cir. 1999). The court may award appropriate compensatory "'relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.'" *Id.* at 1123 (quoting *Parents of Student W. ex rel. Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th

Cir. 1994)).  The court addresses each party's challenges to this part of the Review Officer's

award in separate sections, below.

i.    USD 512's Challenges

USD 512 argues that the award issued by the Review Officer expressed no correlation

between the compensatory education and the deficits in A.B.'s education.  Doc. 29 at 65–70.  It

contends, for instance, that "the Review Officer asserts, without any citation to the administrative

record, that assessments demonstrated that A.B. was regressing in multiple areas."  *Id.* at 67.  It

also argues that, while the Review Officer's Decision "only directly points to A.B.'s deficits

in . . . reading, fine motor skills, and behaviors[,]" the Review Officer "took a generalized

approach to analyzing A.B.'s deficits, without providing a fact-intensive analysis to determine:

(1) the extent of the deficit caused by [USD 512's] purported denial of educational opportunity

and (2) when the period of denial started and ended."  *Id.* at 68.

While the paragraphs immediately preceding the Review Officer's award don't provide

great detail, USD 512's argument that the Review Officer's Decision doesn't provide "a fact-

intensive analysis to determine" the type or duration of educational harm to A.B. is simply

mistaken.  *Id.*  Indeed, the Review Officer's Decision includes 608 statements of factual

conclusions and 179 statements of legal conclusions and analysis.  Together, they provide a

detailed foundation on which the Review Officer based his award.  *See* Doc 1-3.  When deciding

the award for A.B., the Review Officer noted that, at the time of his Decision, "A.B. is currently

operating under an IEP that was developed utilizing an evaluation that was conducted during his

kindergarten year.  A.B. [was then] in third (3rd) grade."  *Id.* at 140 (Review Officer's Decision

¶ A).  And, as the Review Officer and the court now have concluded, that IEP used outdated data

from its inception.  The Review Officer's Decision also concluded that data collected during the

evaluation "revealed that A.B. was not progressing, but rather had regressed, scoring worse in

sixteen (16) areas." *Id.*  The IEP team recorded those regressions in the Socially Savvy checklist from February 2019.  Doc. 1-3 at 57–58 (Review Officer's Decision ¶ 323, 325).

The IEP didn't reflect this information in the first drafts after the IEP team received the data.  *Id.* at 62 (Review Officer's Decision ¶ 339).  It didn't show up in the IEP until the current draft, one dating back to late November 2019.  Doc. 20-8 at 229 (AR 3195).  And by then, it was already outdated.  The Review Officer referenced these shortcomings in the award decision by detailing what the IEE must include to compensate for those educational deficits.  Doc. 1-3 at 142–43 (Review Officer's Decision ¶ 1(e)).  Except for the fine motor skills requirement, the areas provided for in the decision's award represent an appropriate remedy for the deficits that the Review Officer identified in his Decision's extensive factual and legal conclusions.

USD 512 also argues that the Review Officer failed to consider "A.B.'s progress both before and after the implementation of the IEP[.]"  Doc. 29 at 69.  In particular, USD 512 cites the fact that Natalie Beer made multiple statements about A.B.'s progress.  *Id.*  But as the court already has noted, *see supra* at 44–58 (Part III.A.4.b.ii. (concluding that USD 512 failed to monitor A.B.'s progress adequately)), the Beers' derived their impression of A.B.'s progress from USD 512's progress reports filled with conclusory statements—but failing to provide the Beers with the data collection sheets.  The court can't give much credence to progress reports that lack a solid foundation, or the Beers' statements based on incomplete information provided in the first instance by the school district.

Also, USD 512 contends that the court should consider A.B.'s progress since the proceedings commenced.  It cites record evidence that "demonstrates that [USD 512] provided Tier-3 reading interventions to A.B. and that . . . [its] Innovation Specialist . . . testified that A.B.'s reading skills continued to progress through the implementation of those interventions."

Doc. 29 at 68.  And, it argues, "[w]ithout explanation, the Review Officer gave it no consideration in fashioning a compensatory education award."  *Id.*  But these interventions are unrelated to the IEP or any special education and related services since USD 512 declined to include a reading goal in the IEP.  The only relationship between this advancement and the Review Officer's award is its requirement that the "IEP shall consider whether the IEP should include . . . a reading goal[.]"  Doc. 1-3 at 142 (Review Officer's Decision ¶ 1(e)).  USD 512 previously had ignored a reading deficit when deciding on A.B.'s IEP goals without having appropriate data.  The Review Officer's decision requiring that the IEP team *consider* adding a goal in this area represents an award reasonably calculated to meet A.B.'s needs.

Finally, USD 512 argues that the Review Officer "gave no consideration to the role the equities played in determining the amount of compensatory education awarded"—particularly the role that the Beers played in the extended evaluation timeline.  Doc. 29 at 70.  USD 512 quotes the Review Officer's Decision where he notes that USD 512 "'remained responsive'" to the Beers' requests, and did so to the extent that "'the development and implementation of the IEP were delayed due to multiple requests that [USD 512] take additional evaluation measures.'"  *Id.* (quoting Doc. 1-3 at 116 (Review Officer's Decision ¶ 72)).  But USD 512 ignores the salient omission:  the Beers never were "made aware of the implications of extending the deadline or that [USD 512] was under an obligation to complete the evaluation" or otherwise secure informed parental consent to extend the deadline.  Doc. 1-3 at 119 (Review Officer's Decision ¶ 88); *see also supra* at 22–27 (Part III.A.3.a. (holding that USD 512 failed to meet its obligations to complete the evaluation within the deadline)).  Nor does the school district note the Review Officer's conclusion that USD 512 didn't "make any reasonable and prompt efforts to obtain informed consent from the Beers to implement any services to A.B." or convene an IEP

meeting.  Doc. 1-3 at 121 (Review Officer's Decision ¶ 98); *see also supra* at 33–38 (Part III.A.4.a. (holding that USD 512 didn't seek informed parental consent)).  These failures represent significant violations of IDEA.  In contrast, the Beers sought an evaluation conducted in conformity with the statute.  The court isn't persuaded that the Beers' exercise of their statutory right to request an IEE outweighs USD 512's failure to meet its obligations when deciding about the requisite compensatory education.

ii.     The Beers' Challenges

The Beers, too, contend that the Review Officer's award of compensatory education was erroneous.  But they see the error running in the opposite direction, claiming his award doesn't go far enough.  They first argue that the Review Officer erred by requiring USD 512 provide A.B. with a special education IEP specialist, board certified behavior analyst, and educational tutor for three semesters rather than four.  Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 51.  They recognize that this change from the Hearing Officer's Supplementary Decision results from the Review Officer issuing his decision in the middle of a school year, so that—even though the wording didn't change—the Review Officer's award effectively provided one fewer semester of compensatory education.  *Id.*  The Beers argue that "a preponderance of the evidence supports" awarding compensatory education services "to A.B. for two school years to make him whole," and they ask the court to award relief "in terms of months or semesters . . . as opposed to school years[.]"  *Id.* at 52.

USD 512's IDEA violations cover three semesters.  As the court has concluded already, USD 512 began violating IDEA when it missed the December 6, 2018 deadline to complete A.B.'s evaluation and implement an IEP.  This deprived A.B. of a valid, implemented IEP—and thus a FAPE—for the spring and fall of 2019—part of two separate school years—until the Beers gave their consent to the current IEP in December 2019.  But the current IEP contains

77

shortcomings and USD 512 failed to implement and track it adequately, depriving A.B. of a FAPE for spring 2020.  During the spring 2020 semester, the Beers filed a complaint with KSDE, and the factual findings end there.  The court concludes that the Review Officer's award comports with the standard in our Circuit.  It properly "vindicates [A.B.'s] *substantive* right to receive a FABE and [it] compensates for a past deprivation of educational opportunity[.]" *Garcia*, 520 F.3d at 1125 (quotation cleaned up).  USD 512 must provide A.B. with compensatory education for a period equaling the period it deprived him of a FAPE within the scope of these proceedings.  *See Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996) ("In the absence of a violation of his right to an appropriate education, [plaintiff] is not entitled to compensatory education.").  That period covers three semesters.  The Beers adduce no evidence that USD 512 denied A.B. a FAPE after spring 2020.

The Beers also argue that the Review Officer's Decision "erred by eliminating the Hearing Officer's award of [board certified behavior analyst (BCBA)] services for a minimum of eight hours per week[.]"  Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 52.  They contend that the Review Officer failed to "include the eight-hour minimum provision in his decision" that—in the Beers' view—the Hearing Officer awarded.  *Id.* at 53.

But the Beers misconstrue the Hearing Officer's Supplemental Decision.  In the Hearing Officer's description of the BCBA award, the Decision states that "it is *recommended* that the independent BCBA provide a minimum of 8 hours per school week within all school settings in which A.B. participates[.]"  Doc. 1-2 at 7 (Hr'g Officer's Suppl. Decision ¶ 3(n)) (emphasis added).  This recommendation left room for USD 512 to decide the appropriate amount of compensatory education provided through this award.  This approach violated binding precedent in our Circuit.  *See M.S. ex rel. J.S. v. Utah Schs. for Deaf & Blind*, 822 F.3d 1128, 1134–36

(10th Cir. 2016) (holding that court can't delegate discretionary power to decide student's compensatory education to school district that denied FAPE).  The award can't "order[ ] the student's IEP team to determine the type and duration of compensatory services the student" receives.  *Id.* at 1135 (citing *Bd. of Educ. of Fayette Cnty. v. T.D. ex rel. L.M.*, 478 F.3d 307, 312 (6th Cir. 2007)).  The court concludes that the Review Officer correctly struck the provision *recommending* eight hours per week for the BCBA.  And while the Beers contend that requiring the BCBA to provided a minimum of eight hours per week in the school setting is necessary, they haven't adduced any evidence demonstrating how such a significant provision corresponds to any educational detriment A.B. suffered.

Finally, the Beers argue that vague language in the IEP improperly delegates discretion to USD 512.  Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 53–56.  Specifically, they cite language in the Review Officer's decision that the IEP team "'*shall consider whether the IEP should include*'" a number of objectives and goals that A.B. needs.  *Id.* at 54 (emphasis in original) (quoting Doc. 1-3 at 142 (Review Officer's Decision ¶ 1(e))).  They contend that this language "can be construed as simply requiring a round-table discussion, followed by a vote of the IEP team (composed of mostly [USD 512] employees) that A.B. does not need those services."  *Id.* The Beers assert that the Review Officer "already determined that A.B. does need these goals and services," so fashioning the award in this way "impermissibly delegates to A.B.'s IEP team the authority to reduce or terminate" the compensatory education.  *Id.* at 54–55 (citing *M.S.*, 822 F.3d at 1134–35).

But yet again the Beers misconstrue the Review Officer's decision.  Neither the Review Officer nor this court determined the specific goals, objectives, or services that A.B. needs. Instead, the Review Officer's Decision found the IEP used outdated data, school staff failed to

monitor A.B.'s progress adequately, the IEP team denied certain services (such as a reading goal and afternoon paraprofessional support) without first having the data to determine their necessity, and USD 512 didn't inform the Beers properly about the process. *See* Doc. 1-3 at 130–35 (Review Officer's Decision ¶¶ 138–64). And since the current record only contains outdated data, any determinations made based on them is—like the inadequate IEP—insufficient to meet A.B.'s current needs.

The requirement that an IEP team create a reasonably calculated IEP "reflects a recognition that crafting an appropriate program of education requires a prospective judgment" that is "informed not only by the expertise of school officials, but also by the input of the child's parents[.]" *Endrew F.*, 580 U.S. at 399. While the court has broad discretion to determine equitable relief, *see Sch. Comm.*, 471 U.S. at 369, imposing specific goals on the IEP here conflicts with IDEA's aims. For one thing, the current record doesn't contain reasonably current data. And for another, the court doesn't possess the expertise to create an IEP reasonably calculated to suit A.B.'s specific needs. But the Review Officer's award addresses this predicament properly. It requires USD 512 to hire independent specialists to conduct a new FBA and develop a new IEP for A.B. It requires use of reasonably current data and input from the Beers to ensure that A.B.'s compensatory education isn't delegated to the school district that denied him a FAPE earlier. In this sense, the court concludes, the Review Officer appropriately outlined the scope of the compensatory education award by assigning independent specialists to lead A.B.'s IEP.

### 3.   *Specific Remedies*

USD 512 argues that the Review Officer didn't justify the part of his Decision requiring the school district to "assume the costs of an IEE, a special education IEP specialist, and a BCBA[,]" as well as "to reimburse the Beers for the special advocate fees they incurred." Doc.

29 at 71.  It contends that these awards "are not remedies to address an educational deficit; these are attempts to subvert the discretion of [USD 512] in choosing and implementing educational methodologies."  *Id.*

IDEA's regulations guarantee parents "the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency[.]"  34 C.F.R. § 300.502(b)(1).  Also, and as already stated, the court may not delegate the decision about a student's compensatory award to a school district who, it determines, has denied the student a FAPE.  *M.S.*, 822 F.3d at 1134–35.  Here, the Review Officer determined that USD 512 denied A.B. a FAPE and violated IDEA by performing an insufficient evaluation, creating an insufficient IEP, and failing to monitor A.B.'s progress adequately.  Doc. 1-3 at 141–42 (Review Officer's Decision ¶ C).  So, the compensatory education award simply can't return the entirety of the decision about how and what to evaluate to that same school district.  The Review Officer appropriately concluded that USD 512 must provide a new evaluation and IEP, using an independent IEP specialist and BCBA at its own expense.

But the Review Officer's Decision went too far when it awarded the Beers the costs of the advocate's fees.  The Supreme Court has held that "the terms of the IDEA overwhelmingly support the conclusion that prevailing parents may not recover the costs of experts or consultants."  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006).  Courts have construed this prohibition to apply to "education advocates."  *See, e.g.*, *Santamaria v. District of Columbia*, 875 F. Supp. 2d 12, 17 (D.D.C. 2012) (recognizing that "education advocates may not recover fees or costs under the IDEA").  The court finds *Santamaria* persuasive and so the court applies it here, holding that the Beers can't recover their costs for hiring a special education advocate.

Finally, both parties contend that the awards for the IEP specialist and BCBA lack specificity and don't state clearly what role they will play.  *See* Doc. 29 at 71–72; Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 56.  USD 512 contends that the award doesn't provide a proper explanation about the function and duration of the duties for these positions.  Doc. 29 at 72.  The Beers argue that the court "should revise the Review Officer's award" and "clearly state that the independent evaluator(s) performing A.B.'s independent evaluations will both propose and assist in development of the additional goals and services added to A.B.'s IEP."  Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 56.  The court isn't persuaded by either argument.

The Review Officer's Decision consumes more than two pages (single-spaced) explaining the functions of the two roles, the required qualifications, and the duration of their engagement.  *See, e.g.*, Doc. 1-3 at 143 (Review Officer's Decision ¶ 2.a) (requiring an "IEP specialist to help ensure that the IEP for A.B. . . . meet[s] A.B.'s current educational needs and to help A.B. make educational progress"); *id.* (Review Officer's Decision ¶ 2.b–e) (identifying when USD 512 must commence search, required qualifications, and length of contract for IEP specialist).  *See also id.* at 143–45 (Review Officer's Decision ¶ 3.a–f) (providing similar information for BCBA).  Moreover, existing regulatory requirements suss out a school district's duties for an IEP team.  *See* Kan. Admin. Regs § 91-40-8(c).  Together, the Review Officer's Decision coupled with regulatory guidance, provides sufficient instruction for people of good faith to discharge their duties to comply with the Decision.  *See* Doc. 1-3 at 143–44 (Review Officer's Decision ¶¶ 2.d, 3.e) (requiring USD 512 "act in good faith to permit [A.B.'s] Parents full participation in the selection process for" the IEP specialist and BCBA).

This guidance suffices.  For one thing, it recognizes that the IEP specialist must "meet A.B.'s *current* educational needs[.]"  *Id.* at 143 (Review Officer's Decision ¶ 2.a) (emphasis

added).  Any effort to define the IEP specialist and BCBA's roles more rigidly would ignore the need to meet and address A.B.'s needs as they actually will exist when the parties execute the remedies.  For another, both parties—the school district and the parents—could have presented evidence that could have fixed the alleged vagueness they perceive.  *See* 20 U.S.C. § 1415(i)(2)(c)(ii) (stating the district court "shall hear additional evidence at the request of a party").  Neither party used this opportunity.  Absent evidence to inform the more specific directions the parties claim to need, the court declines their invitation to dabble in educational policy—and on a basis uninformed by the record.  The court denies each party's request to add additional definition to the Review Officer's Decision about the IEP specialist and BCBA.[20]

## IV.    Conclusion

For the reasons explained above, the court affirms in part and overrules in part the Review Officer's Decision.

**IT IS THEREFORE ORDERED BY THE COURT THAT** USD 512's Motion for Judgment on the Administrative Record (Case No. 21-cv-2604-DDC-TJJ, Doc. 28) is granted in part, and denied in part, as explained in this Order.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Beers' Motion for Judgment on the Administrative Record (Case No. 21-cv-2608-DDC-TJJ, Doc. 24) is granted in part, and denied in part, as explained in this Order.

**IT IS FURTHER ORDERED BY THE COURT THAT** USD 512 must comply with the compensatory award as provided in this Order.

---

[20]    The Beers' criticism of the Review Officer's Decision fares no better.  *See* Case No. 21-cv-2608-DDC-TJJ, Doc. 25 at 56.  They claim the court should revise the existing Decision to "state that the independent evaluator(s) performing A.B.'s independent evaluations will both propose and assist in development of the additional goals and services added to A.B.'s IEP." *Id.*  And on what should the court base such tinkering?  The Beers never say.  The court again declines their invitation to feign educational expertise uninformed by record evidence.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Clerk of the Court shall enter Judgment in Case Nos. 21-cv-2604 and 21-cv-2608, closing both cases with the Judgment's entry.

**IT IS SO ORDERED.**

**Dated this 17th day of March, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
